## ESCOBEDO *v.* ILLINOIS.

No. 615.   Argued April 29, 1964.—Decided June 22, 1964.

*Barry L. Kroll* argued the cause for petitioner.   With him on the brief was *Donald M. Haskell.*

*James R. Thompson* argued the cause for respondent. With him on the brief were *Daniel P. Ward* and *Elmer C. Kissane.*

*Bernard Weisberg* argued the cause for the American Civil Liberties Union, as *amicus curiae,* urging reversal. With him on the brief was *Walter T. Fisher.*

MR. JUSTICE GOLDBERG delivered the opinion of the Court.

The critical question in this case is whether, under the circumstances, the refusal by the police to honor petitioner's request to consult with his lawyer during the course of an interrogation constitutes a denial of "the Assistance of Counsel" in violation of the Sixth Amendment to the Constitution as "made obligatory upon the States by the Fourteenth Amendment," *Gideon* v. *Wainwright,* 372 U. S. 335, 342, and thereby renders inadmissible in a state criminal trial any incriminating statement elicited by the police during the interrogation.

On the night of January 19, 1960, petitioner's brother-in-law was fatally shot. In the early hours of the next morning, at 2:30 a. m., petitioner was arrested without a warrant and interrogated. Petitioner made no statement to the police and was released at 5 that afternoon pursuant to a state court writ of habeas corpus obtained by Mr. Warren Wolfson, a lawyer who had been retained by petitioner.

On January 30, Benedict DiGerlando, who was then in police custody and who was later indicted for the murder along with petitioner, told the police that petitioner had fired the fatal shots. Between 8 and 9 that evening, petitioner and his sister, the widow of the deceased, were arrested and taken to police headquarters. En route to the police station, the police "had handcuffed the defendant behind his back," and "one of the arresting officers told defendant that DiGerlando had named him as the one who shot" the deceased. Petitioner testified, without contradiction, that the "detectives said they had us pretty well, up pretty tight, and we might as well admit to this crime," and that he replied, "I am sorry but I would like to have advice from my lawyer." A police officer testified that although petitioner was not formally charged "he was in custody" and "couldn't walk out the door."

480

Shortly after petitioner reached police headquarters, his retained lawyer arrived. The lawyer described the ensuing events in the following terms:

"On that day I received a phone call [from "the mother of another defendant"] and pursuant to that phone call I went to the Detective Bureau at 11th and State. The first person I talked to was the Sergeant on duty at the Bureau Desk, Sergeant Pidgeon. I asked Sergeant Pidgeon for permission to speak to my client, Danny Escobedo. . . . Sergeant Pidgeon made a call to the Bureau lockup and informed me that the boy had been taken from the lockup to the Homicide Bureau. This was between 9:30 and 10:00 in the evening. Before I went anywhere, he called the Homicide Bureau and told them there was an attorney waiting to see Escobedo. He told me I could·not see him. Then I went upstairs to the Homicide Bureau. There were several Homicide Detectives around and I talked to them. I identified myself as Escobedo's attorney and asked permission to see him. They said I could not. . . . The police officer told me to see Chief Flynn who was on duty. I identified myself to Chief Flynn and asked permission to see my client. He said I could not. . . . I think it was approximately 11:00 o'clock. He said I couldn't·see him because they hadn't completed questioning. . . . [F]or a second or two I spotted him in an office in the Homicide Bureau. The door was open and I could see through the office. . . . I waved to him and he waved back and then the door was closed, by one of the officers at Homicide.[1]  There were four or five officers milling

---

[1] Petitioner testified that this ambiguous gesture "could have meant most anything," but that he "took it upon [his] own to think that [the lawyer was telling him] not to say anything," and that the lawyer "wanted to talk" to him.

around the Homicide Detail that night. As to whether I talked to Captain Flynn any later that day, I waited around for another hour or two and went back again and renewed by [sic] request to see my client. He again told me I could not. . . . I filed an official complaint with Commissioner Phelan of the Chicago Police Department. I had a conversation with every police officer I could find. I was told at Homicide that I couldn't see him and I would have to get a writ of habeas corpus. I left the Homicide Bureau and from the Detective Bureau at 11th and State at approximately 1:00 A. M. [Sunday morning] I had no opportunity to talk to my client that night. I quoted to Captain Flynn the Section of the Criminal Code which allows an attorney the right to see his client." [2]

Petitioner testified that during the course of the interrogation he repeatedly asked to speak to his lawyer and that the police said that his lawyer "didn't want to see" him. The testimony of the police officers confirmed these accounts in substantial detail.

Notwithstanding repeated requests by each, petitioner and his retained lawyer were afforded no opportunity to consult during the course of the entire interrogation. At one point, as previously noted, petitioner and his attorney came into each other's view for a few moments but the attorney was quickly ushered away. Petitioner testified "that he heard a detective telling the attorney the latter would not be allowed to talk to [him] 'until they

---

[2] The statute then in effect provided in pertinent part that: "All public officers . . . having the custody of any person . . . restrained of his liberty for any alleged cause whatever, shall, except in cases of imminent danger of escape, admit any practicing attorney . . . whom such person . . . may desire to see or consult . . . ." Ill. Rev. Stat. (1959), c. 38, § 477. Repealed as of Jan. 1, 1964, by Act approved Aug. 14, 1963, H. B. No. 851.

were done' " and that he heard the attorney being refused permission to remain in the adjoining room. A police officer testified that he had told the lawyer that he could not see petitioner until "we were through interrogating" him.

There is testimony by the police that during the interrogation, petitioner, a 22-year-old of Mexican extraction with no record of previous experience with the police, "was handcuffed"[3] in a standing position and that he "was nervous, he had circles under his eyes and he was upset" and was "agitated" because "he had not slept well in over a week."

It is undisputed that during the course of the interrogation Officer Montejano, who "grew up" in petitioner's neighborhood, who knew his family, and who uses "Spanish language in [his] police work," conferred alone with petitioner "for about a quarter of an hour. . . ." Petitioner testified that the officer said to him "in Spanish that my sister and I could go home if I pinned it on Benedict DiGerlando," that "he would see to it that we would go home and be held only as witnesses, if anything, if we had made a statement against DiGerlando . . . , that we would be able to go home that night." Petitioner testified that he made the statement in issue because of this assurance. Officer Montejano denied offering any such assurance.

A police officer testified that during the interrogation the following occurred:

> "I informed him of what DiGerlando told me and when I did, he told me that DiGerlando was [lying] and I said, 'Would you care to tell DiGerlando that?' and he said, 'Yes, I will.' So, I

---

[3] The trial judge justified the handcuffing on the ground that it "is ordinary police procedure."

> brought . . . Escobedo in and he confronted DiGer-
> lando and he told him that he was lying and said, 'I
> didn't shoot Manuel, you did it.' "

In this way, petitioner, for the first time, admitted to some knowledge of the crime. After that he made additional statements further implicating himself in the murder plot. At this point an Assistant State's Attorney, Theodore J. Cooper, was summoned "to take" a statement. Mr. Cooper, an experienced lawyer who was assigned to the Homicide Division to take "statements from some defendants and some prisoners that they had in custody," "took" petitioner's statement by asking carefully framed questions apparently designed to assure the admissibility into evidence of the resulting answers. Mr. Cooper testified that he did not advise petitioner of his constitutional rights, and it is undisputed that no one during the course of the interrogation so advised him.

Petitioner moved both before and during trial to suppress the incriminating statement, but the motions were denied. Petitioner was convicted of murder and he appealed the conviction.

The Supreme Court of Illinois, in its original opinion of February 1, 1963, held the statement inadmissible and reversed the conviction. The court said:

> "[I]t seems manifest to us, from the undisputed
> evidence and the circumstances surrounding defend-
> ant at the time of his statement and shortly prior
> thereto, that the defendant understood he would be
> permitted to go home if he gave the statement and
> would be granted an immunity from prosecution."

Compare *Lynumn* v. *Illinois*, 372 U. S. 528.
The State petitioned for, and the court granted, rehearing. The court then affirmed the conviction. It said: "[T]he

officer denied making the promise and the trier of fact believed him. We find no reason for disturbing the trial court's finding that the confession was voluntary." [4] 28 Ill. 2d 41, 45–46, 190 N. E. 2d 825, 827. The court also held, on the authority of this Court's decisions in *Crooker* v. *California,* 357 U. S. 433, and *Cicenia* v. *Lagay,* 357 U. S. 504, that the confession was admissible even though "it was obtained after he had requested the assistance of counsel, which request was denied." 28 Ill. 2d, at 46, 190 N. E. 2d, at 827. We granted a writ of certiorari to consider whether the petitioner's statement was constitutionally admissible at his trial. 375 U. S. 902. We conclude, for the reasons stated below, that it was not and, accordingly, we reverse the judgment of conviction.

In *Massiah* v. *United States,* 377 U. S. 201, this Court observed that "a Constitution which guarantees a defendant the aid of counsel at . . . trial could surely vouchsafe no less to an indicted defendant under interrogation by the police in a completely extrajudicial proceeding. Anything less . . . might deny a defendant 'effective representation by counsel at the only stage when

---

[4] Compare *Haynes* .v. *Washington,* 373 U. S. 503, 515 (decided on the same day as the decision of the Illinois Supreme Court here), where we said:

"Our conclusion is in no way foreclosed, as the State contends, by the fact that the state trial judge or the jury may have reached a different result on this issue.

"It is well settled that the duty of constitutional adjudication resting upon this Court requires that the question whether the Due Process Clause of the Fourteenth Amendment has been violated by admission into evidence of a coerced confession be the subject of an *independent* determination here, see, *e. g., Ashcraft* v. *Tennessee,* 322 U. S. 143, 147–148; 'we cannot escape the responsibility of making our own examination of the record,' *Spano* v. *New York,* 360 U. S. 315, 316." (Emphasis in original.)

legal aid and advice would help him.' "  *Id.,* at 204, quoting Douglas, J., concurring in *Spano* v. *New York,* 360 U. S. 315, 326.

The interrogation here was conducted before petitioner was formally indicted. But in the context of this case, that fact should make no difference. When petitioner requested, and was denied, an opportunity to consult with his lawyer, the investigation had ceased to be a general investigation of "an unsolved crime." *Spano* v. *New York,* 360 U. S. 315, 327 (Stewart, J., concurring). Petitioner had become the accused, and the purpose of the interrogation was to "get him" to confess his guilt despite his constitutional right not to do so. At the time of his arrest and throughout the course of the interrogation, the police told petitioner that they had convincing evidence that he had fired the fatal shots. Without informing him of his absolute right to remain silent in the face of this accusation, the police urged him to make a statement.[5] As this Court observed many years ago:

"It cannot be doubted that, placed in the position in which the accused was when the statement was made to him that the other suspected person had charged him with crime, the result was to produce upon his mind the fear that if he remained silent it would be considered an admission of guilt, and therefore render certain his being committed for trial as the guilty person, and it cannot be conceived that the converse impression would not also have nat-

---

[5] Although there is testimony in the record that petitioner and his lawyer had previously discussed what petitioner should do in the event of interrogation, there is no evidence that they discussed what petitioner should, or could, do in the face of a false accusation that he had fired the fatal bullets.

urally arisen, that by denying there was hope of removing the suspicion from himself." *Bram* v. *United States,* 168 U. S. 532, 562.

Petitioner, a layman, was undoubtedly unaware that under Illinois law an admission of "mere" complicity in the murder plot was legally as damaging as an admission of firing of the fatal shots. *Illinois* v. *Escobedo,* 28 Ill. 2d 41, 190 N. E. 2d 825. The "guiding hand of counsel" was essential to advise petitioner of his rights in this delicate situation. *Powell* v. *Alabama,* 287 U. S. 45, 69. This was the "stage when legal aid and advice" were most critical to petitioner. *Massiah* v. *United States, supra,* at 204. It was a stage surely as critical as was the arraignment in *Hamilton* v. *Alabama,* 368 U. S. 52, and the preliminary hearing in *White* v. *Maryland,* 373 U. S. 59. What happened at this interrogation could certainly "affect the whole trial," *Hamilton* v. *Alabama, supra,* at 54, since rights "may be as irretrievably lost, if not then and there asserted, as they are when an accused represented by counsel waives a right for strategic purposes." *Ibid.* It would exalt form over substance to make the right to counsel, under these circumstances, depend on whether at the time of the interrogation, the authorities had secured a formal indictment. Petitioner had, for all practical purposes, already been charged with murder.

The New York Court of Appeals, whose decisions this Court cited with approval in *Massiah,* 377 U. S. 201, at 205, has recently recognized that, under circumstances such as those here, no meaningful distinction can be drawn between interrogation of an accused before and after formal indictment. In *People* v. *Donovan,* 13 N. Y. 2d 148, 193 N. E. 2d 628, that court, in an opinion by Judge Fuld, held that a "confession taken from a defendant, during a period of detention [prior to indictment], after his attorney had requested and been denied access

to him" could not be used against him in a criminal trial.[6] *Id.*, at 151, 193 N. E. 2d, at 629. The court observed that it "would be highly incongruous if our system of justice permitted the district attorney, the lawyer representing the State, to extract a confession from the accused while his own lawyer, seeking to speak with him, was kept from him by the police." *Id.*, at 152, 193 N. E. 2d, at 629.[7]

In *Gideon* v. *Wainwright,* 372 U. S. 335, we held that every person accused of a crime, whether state or federal, is entitled to a lawyer at trial.[8] The rule sought by the State here, however, would make the trial no more than an appeal from the interrogation; and the "right to use counsel at the formal trial [would be] a very hollow thing [if], for all practical purposes, the conviction is already assured by pretrial examination." *In re Groban,* 352 U. S.

---

[6] The English Judges' Rules also recognize that a functional rather than a formal test must be applied and that, under circumstances such as those here, no special significance should be attached to formal indictment. The applicable Rule does not permit the police to question an accused, except in certain extremely limited situations not relevant here, at any time after the defendant "has been charged *or informed that he may be prosecuted."* [1964] Crim. L. Rev. 166–170 (emphasis supplied). Although voluntary statements obtained in violation of these rules are not automatically excluded from evidence the judge may, in the exercise of his discretion, exclude them. "Recent cases suggest that perhaps the judges have been tightening up [and almost] inevitably, the effect of the new Rules will be to stimulate this tendency." *Id.*, at 182.

[7] Canon 9 of the American Bar Association's Canon of Professional Ethics provides that:
"A lawyer should not in any way communicate upon the subject of controversy with a party represented by counsel; much less should he undertake to negotiate or compromise the matter with him, but should deal only with his counsel. It is incumbent upon the lawyer most particularly to avoid everything that may tend to mislead a party not represented by counsel, and he should not undertake to advise him as to the law." See Broeder, Wong Sun v. United States: A Study in Faith and Hope, 42 Neb. L. Rev. 483, 599–604.

[8] Twenty-two States, including Illinois, urged us so to hold.

330, 344 (BLACK, J., dissenting).[9] "One can imagine a cynical prosecutor saying: 'Let them have the most illustrious counsel, now. They can't escape the noose. There is nothing that counsel can do for them at the trial.' " *Ex parte Sullivan,* 107 F. Supp. 514, 517–518.

It is argued that if the right to counsel is afforded prior to indictment, the number of confessions obtained by the police will diminish significantly, because most confessions are obtained during the period between arrest and indictment,[10] and "any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances." *Watts* v. *Indiana,* 338 U. S. 49, 59 (Jackson, J., concurring in part and dissenting in part). This argument, of course, cuts two ways. The fact that many confessions are obtained during this period points up its critical nature as a "stage when legal aid and advice" are surely needed. *Massiah* v. *United States, supra,* at 204; *Hamilton* v. *Alabama, supra; White* v. *Maryland, supra.* The right to counsel would indeed be hollow if it began at a period when few confessions were obtained. There is necessarily a direct relationship between the importance of a stage to the police in their quest for a confession and the criticalness of that stage to the accused in his need for legal advice. Our Constitution, unlike some others, strikes the balance in favor of the right of the accused to be advised by his lawyer of his privilege against self-incrimination. See Note, 73 Yale L. J. 1000, 1048–1051 (1964).

We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement

---

[9] The Soviet criminal code does not permit a lawyer to be present during the investigation. The Soviet trial has thus been aptly described as "an appeal from the pretrial investigation." Feifer, Justice in Moscow (1964), 86.

[10] See Barrett, Police Practices and the Law—From Arrest to Release or Charge, 50 Cal. L. Rev. 11, 43 (1962).

which comes to depend on the "confession" will, in the long run, be less reliable[11] and more subject to abuses[12] than a system which depends on extrinsic evidence independently secured through skillful investigation. As Dean Wigmore so wisely said:

> *"[A]ny system of administration which permits the prosecution to trust habitually to compulsory self-disclosure as a source of proof must itself suffer morally thereby.* The inclination develops to rely mainly upon such evidence, and to be satisfied with an incomplete investigation of the other sources. The exercise of the power to extract answers begets a forgetfulness of the just limitations of that power. The simple and peaceful process of questioning breeds a readiness to resort to bullying and to physical force and torture. If there is a right to an answer, there soon seems to be a right to the expected answer,— that is, to a confession of guilt. Thus the legitimate use grows into the unjust abuse; ultimately, the innocent are jeopardized by the encroachments of a bad system. Such seems to have been the course of experience in those legal systems where the privilege was not recognized." 8 Wigmore, Evidence (3d ed. 1940), 309. (Emphasis in original.)

---

[11] See Committee Print, Subcommittee to Investigate Administration of the Internal Security Act, Senate Committee on the Judiciary, 85th Cong., 1st Sess., reporting and analyzing the proceedings at the XXth Congress of the Communist Party of the Soviet Union, February 25, 1956, exposing the false confessions obtained during the Stalin purges of the 1930's. See also *Miller* v. *United States,* 320 F. 2d 767, 772–773 (opinion of Chief Judge Bazelon); Lifton, Thought Reform and the Psychology of Totalism (1961); Rogge, Why Men Confess (1959); Schein, Coercive Persuasion (1961).

[12] See Stephen, History of the Criminal Law, quoted in 8 Wigmore, Evidence (3d ed. 1940), 312; Report and Recommendations of the Commissioners' Committee on Police Arrests for Investigation, District of Columbia (1962).

This Court also has recognized that "history amply shows that confessions have often been extorted to save law enforcement officials the trouble and effort of obtaining valid and independent evidence . . . ." *Haynes* v. *Washington,* 373 U. S. 503, 519.

We have also learned the companion lesson of history that no system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the citizens' abdication through unawareness of their constitutional rights. No system worth preserving should have to *fear* that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise, these rights.[13] If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system.[14]

We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the sus-

---

[13] Cf. Report of Attorney General's Committee on Poverty and the Administration of Federal Criminal Justice (1963), 10–11: "The survival of our system of criminal justice and the values which it advances depends upon a constant, searching, and creative questioning of official decisions and assertions of authority at all stages of the process. . . . Persons [denied access to counsel] are incapable of providing the challenges that are indispensable to satisfactory operation of the system. The loss to the interests of accused individuals, occasioned by these failures, are great and apparent. It is also clear that a situation in which persons are required to contest a serious accusation but are denied access to the tools of contest is offensive to fairness and equity. Beyond these considerations, however, is the fact that [this situation is] detrimental to the proper functioning of the system of justice and that the loss in vitality of the adversary system, thereby occasioned, significantly endangers the basic interests of a free community."

[14] The accused may, of course, intelligently and knowingly waive his privilege against self-incrimination and his right to counsel either at a pretrial stage or at the trial. See *Johnson* v. *Zerbst,* 304 U. S. 458. But no knowing and intelligent waiver of any constitutional right can be said to have occurred under the circumstances of this case.

pect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied "the Assistance of Counsel" in violation of the Sixth Amendment to the Constitution as "made obligatory upon the States by the Fourteenth Amendment," *Gideon* v. *Wainwright,* 372 U. S., at 342, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial.

*Crooker* v. *California,* 357 U. S. 433, does not compel a contrary result. In that case the Court merely rejected the absolute rule sought by petitioner, that "every state denial of a request to contact counsel [is] an infringement of the constitutional right *without regard to the circumstances of the case.*" *Id.,* at 440. (Emphasis in original.) In its place, the following rule was announced:

> "[S]tate refusal of a request to engage counsel violates due process not only if the accused is deprived of counsel at trial on the merits, . . . *but also if he is deprived of counsel for any part of the pretrial proceedings,* provided that he is so prejudiced thereby as to infect his subsequent trial with an absence of 'that fundamental fairness essential to the very concept of justice. . . .' The latter determination necessarily depends upon all the circumstances of the case." 357 U. S., at 439–440. (Emphasis added.)

The Court, applying "these principles" to "the sum total of the circumstances [there] during the time petitioner was without counsel," *id.,* at 440, concluded that he had not been fundamentally prejudiced by the denial of his request for counsel. Among the critical circumstances which distinguish that case from this one are that the petitioner there, but not here, was explicitly advised by the police of his constitutional right to remain silent and

not to "say anything" in response to the questions, *id.*, at 437, and that petitioner there, but not here, was a well-educated man who had studied criminal law while attending law school for a year. The Court's opinion in *Cicenia* v. *Lagay*, 357 U. S. 504, decided the same day, merely said that the "contention that petitioner had a constitutional right to confer with counsel is disposed of by *Crooker* v. *California* . . . ." That case adds nothing, therefore, to *Crooker*. In any event, to the extent that *Cicenia* or *Crooker* may be inconsistent with the principles announced today, they are not to be regarded as controlling.[15]

Nothing we have said today affects the powers of the police to investigate "an unsolved crime," *Spano* v. *New York*, 360 U. S. 315, 327 (STEWART, J., concurring), by gathering information from witnesses and by other "proper investigative efforts." *Haynes* v. *Washington*, 373 U. S. 503, 519. We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer.

The judgment of the Illinois Supreme Court is reversed and the case remanded for proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE HARLAN, dissenting.

I would affirm the judgment of the Supreme Court of Illinois on the basis of *Cicenia* v. *Lagay*, 357 U. S. 504,

---

[15] The authority of *Cicenia* v. *Lagay*, 357 U. S. 504, and *Crooker* v. *California*, 357 U. S. 433, was weakened by the subsequent decisions of this Court in *Hamilton* v. *Alabama*, 368 U. S. 52, *White* v. *Maryland*, 373 U. S. 59, and *Massiah* v. *United States*, 377 U. S. 201 (as the dissenting opinion in the last-cited case recognized).

decided by this Court only six years ago. Like my Brother WHITE, *post,* p. 495, I think the rule announced today is most ill-conceived and that it seriously and unjustifiably fetters perfectly legitimate methods of criminal law enforcement.

MR. JUSTICE STEWART, dissenting.

I think this case is directly controlled by *Cicenia* v. *Lagay,* 357 U. S. 504, and I would therefore affirm the judgment.

*Massiah* v. *United States,* 377 U. S. 201, is not in point here. In that case a federal grand jury had indicted Massiah. He had retained a lawyer and entered a formal plea of not guilty. Under our system of federal justice an indictment and arraignment are followed by a trial, at which the Sixth Amendment guarantees the defendant the assistance of counsel.* But Massiah was released on bail, and thereafter agents of the Federal Government deliberately elicited incriminating statements from him in the absence of his lawyer. We held that the use of these statements against him at his trial denied him the basic protections of the Sixth Amendment guarantee. Putting to one side the fact that the case now before us is not a federal case, the vital fact remains that this case does not involve the deliberate interrogation of a defendant after the initiation of judicial proceedings against him. The Court disregards this basic difference between the present case and Massiah's, with the bland assertion that "that fact should make no difference." *Ante,* p. 485.

It is "that fact," I submit, which makes all the difference. Under our system of criminal justice the institution of formal, meaningful judicial proceedings, by way of indictment, information, or arraignment, marks the

---

*"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."

point at which a criminal investigation has ended and adversary proceedings have commenced. It is at this point that the constitutional guarantees attach which pertain to a criminal trial. Among those guarantees are the right to a speedy trial, the right of confrontation, and the right to trial by jury. Another is the guarantee of the assistance of counsel. *Gideon* v. *Wainwright,* 372 U. S. 335; *Hamilton* v. *Alabama,* 368 U. S. 52; *White* v. *Maryland,* 373 U. S. 59.

The confession which the Court today holds inadmissible was a voluntary one. It was given during the course of a perfectly legitimate police investigation of an unsolved murder. The Court says that what happened during this investigation "affected" the trial. I had always supposed that the whole purpose of a police investigation of a murder was to "affect" the trial of the murderer, and that it would be only an incompetent, unsuccessful, or corrupt investigation which would not do so. The Court further says that the Illinois police officers did not advise the petitioner of his "constitutional rights" before he confessed to the murder. This Court has never held that the Constitution requires the police to give any "advice" under circumstances such as these.

Supported by no stronger authority than its own rhetoric, the Court today converts a routine police investigation of an unsolved murder into a distorted analogue of a judicial trial. It imports into this investigation constitutional concepts historically applicable only after the onset of formal prosecutorial proceedings. By doing so, I think the Court perverts those precious constitutional guarantees, and frustrates the vital interests of society in preserving the legitimate and proper function of honest and purposeful police investigation.

Like my Brother CLARK, I cannot escape the logic of my Brother WHITE's conclusions as to the extraordinary implications which emanate from the Court's opinion in

this case, and I share their views as to the untold and highly unfortunate impact today's decision may have upon the fair administration of criminal justice. I can only hope we have completely misunderstood what the Court has said.

MR. JUSTICE WHITE, with whom MR. JUSTICE CLARK and MR. JUSTICE STEWART join, dissenting.

In *Massiah* v. *United States,* 377 U. S. 201, the Court held that as of the date of the indictment the prosecution is disentitled to secure admissions from the accused. The Court now moves that date back to the time when the prosecution begins to "focus" on the accused. Although the opinion purports to be limited to the facts of this case, it would be naive to think that the new constitutional right announced will depend upon whether the accused has retained his own counsel, cf. *Gideon* v. *Wainright,* 372 U. S. 335; *Griffin* v. *Illinois,* 351 U. S. 12; *Douglas* v. *California,* 372 U. S. 353, or has asked to consult with counsel in the course of interrogation. Cf. *Carnley* v. *Cochran,* 369 U. S. 506. At the very least the Court holds that once the accused becomes a suspect and, presumably, is arrested, any admission made to the police thereafter is inadmissible in evidence unless the accused has waived his right to counsel. The decision is thus another major step in the direction of the goal which the Court seemingly has in mind—to bar from evidence all admissions obtained from an individual suspected of crime, whether involuntarily made or not. It does of course put us one step "ahead" of the English judges who have had the good sense to leave the matter a discretionary one with the trial court.* I reject this step and

---

* "[I]t seeems from reported cases that the judges have given up enforcing their own rules, for it is no longer the practice to exclude evidence obtained by questioning in custody. . . . A traditional principle of 'fairness' to criminals, which has quite possibly lost some of

the invitation to go farther which the Court has now issued.

By abandoning the voluntary-involuntary test for admissibility of confessions, the Court seems driven by the notion that it is uncivilized law enforcement to use an accused's own admissions against him at his trial. It attempts to find a home for this new and nebulous rule of due process by attaching it to the right to counsel guaranteed in the federal system by the Sixth Amendment and binding upon the States by virtue of the due process guarantee of the Fourteenth Amendment. *Gideon* v. *Wainwright, supra.* The right to counsel now not only entitles the accused to counsel's advice and aid in preparing for trial but stands as an impenetrable barrier to any interrogation once the accused has become a suspect. From that very moment apparently his right to counsel attaches, a rule wholly unworkable and impossible to administer unless police cars are equipped with public defenders and undercover agents and police informants have defense counsel at their side. I would not abandon the Court's prior cases defining with some care and analysis the circumstances requiring the presence or aid of counsel and substitute the amorphous and wholly unworkable principle that counsel is constitutionally required whenever he would or could be helpful. *Hamilton* v. *Alabama,* 368 U. S. 52; *White* v. *Maryland,* 373 U. S. 59; *Gideon* v.

---

the reason for its existence, is maintained in words while it is disregarded in fact. . . .

"The reader may be expecting at this point a vigorous denunciation of the police and of the judges, and a plea for a return to the Judges' Rules as interpreted in 1930. What has to be considered, however, is whether these Rules are a workable part of the machinery of justice. Perhaps the truth is that the Rules have been abandoned, by tacit consent, just because they are 'an unreasonable restriction upon the activities of the police in bringing criminals to book." Williams, Questioning by the Police: Some Practical Considerations, [1960] Crim. L. Rev. 325, 331–332. See also [1964] Crim. L. Rev. 161–182.

*Wainwright, supra.* These cases dealt with the require-
ment of counsel at proceedings in which definable rights
could be won or lost, not with stages where probative evi-
dence might be obtained. Under this new approach one
might just as well argue that a potential defendant is
constitutionally entitled to a lawyer before, not after, he
commits a crime, since it is then that crucial incriminating
evidence is put within the reach of the Government by the
would-be accused. Until now there simply has been no
right guaranteed by the Federal Constitution to be free
from the use at trial of a voluntary admission made prior
to indictment.

It is incongruous to assume that the provision for coun-
sel in the Sixth Amendment was meant to amend or
supersede the self-incrimination provision of the Fifth
Amendment, which is now applicable to the States. *Mal-
loy* v. *Hogan,* 378 U. S. 1. That amendment addresses
itself to the very issue of incriminating admissions of an
accused and resolves it by proscribing only compelled
statements. Neither the Framers, the constitutional
language, a century of decisions of this Court nor Pro-
fessor Wigmore provides an iota of support for the idea
that an accused has an absolute constitutional right not
to answer even in the absence of compulsion—the con-
stitutional right not to incriminate himself by making
voluntary disclosures.

Today's decision cannot be squared with other provi-
sions of the Constitution which, in my view, define the
system of criminal justice this Court is empowered to
administer. The Fourth Amendment permits upon prob-
able cause even compulsory searches of the suspect and
his possessions and the use of the fruits of the search at
trial, all in the absence of counsel. The Fifth Amend-
ment and state constitutional provisions authorize, in-
deed require, inquisitorial grand jury proceedings at
which a potential defendant, in the absence of counsel,

is shielded against no more than compulsory incrimination. *Mulloney* v. *United States*, 79 F. 2d 566, 578 (C. A. 1st Cir.); *United States* v. *Benjamin*, 120 F. 2d 521, 522 (C. A. 2d Cir.); *United States* v. *Scully*, 225 F. 2d 113, 115 (C. A. 2d Cir.); *United States* v. *Gilboy*, 160 F. Supp. 442 (D. C. M. D. Pa.). A grand jury witness, who may be a suspect, is interrogated and his answers, at least until today, are admissible in evidence at trial. And these provisions have been thought of as constitutional safeguards to persons suspected of an offense. Furthermore, until now, the Constitution has permitted the accused to be fingerprinted and to be identified in a line-up or in the courtroom itself.

The Court chooses to ignore these matters and to rely on the virtues and morality of a system of criminal law enforcement which does not depend on the "confession." No such judgment is to be found in the Constitution. It might be appropriate for a legislature to provide that a suspect should not be consulted during a criminal investigation; that an accused should never be called before a grand jury to answer, even if he wants to, what may well be incriminating questions; and that no person, whether he be a suspect, guilty criminal or innocent bystander, should be put to the ordeal of responding to orderly non-compulsory inquiry by the State. But this is not the system our Constitution requires. The only "inquisitions" the Constitution forbids are those which compel incrimination. Escobedo's statements were not compelled and the Court does not hold that they were.

This new American judges' rule, which is to be applied in both federal and state courts, is perhaps thought to be a necessary safeguard against the possibility of extorted confessions. To this extent it reflects a deep-seated distrust of law enforcement officers everywhere, unsupported by relevant data or current material based upon our own

experience. Obviously law enforcement officers can make mistakes and exceed their authority, as today's decision shows that even judges can do, but I have somewhat more faith than the Court evidently has in the ability and desire of prosecutors and of the power of the appellate courts to discern and correct such violations of the law.

The Court may be concerned with a narrower matter: the unknowing defendant who responds to police questioning because he mistakenly believes that he must and that his admissions will not be used against him. But this worry hardly calls for the broadside the Court has now fired. The failure to inform an accused that he need not answer and that his answers may be used against him is very relevant indeed to whether the disclosures are compelled. Cases in this Court, to say the least, have never placed a premium on ignorance of constitutional rights. If an accused is told he must answer and does not know better, it would be very doubtful that the resulting admissions could be used against him. When the accused has not been informed of his rights at all the Court characteristically and properly looks very closely at the surrounding circumstances. See *Ward* v. *Texas,* 316 U. S. 547; *Haley* v. *Ohio,* 332 U. S. 596; *Payne* v. *Arkansas,* 356 U. S. 560. I would continue to do so. But in this case Danny Escobedo knew full well that he did not have to answer and knew full well that his lawyer had advised him not to answer.

I do not suggest for a moment that law enforcement will be destroyed by the rule announced today. The need for peace and order is too insistent for that. But it will be crippled and its task made a great deal more difficult, all in my opinion, for unsound, unstated reasons, which can find no home in any of the provisions of the Constitution.