[Crim. No. 4505.   First Dist., Div. Two.   Nov. 16, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. DONALD
SEALS, Defendant and Appellant.

Jack K. Berman and Burton Marks for Defendant and
Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr.,
Robert R. Granucci and James Murad, Deputy Attorneys Gen-
eral, for Plaintiff and Respondent.

SHOEMAKER, P. J.—Appellant Donald Seals was charged by indictment with murder, and, after a trial by jury, was convicted of voluntary manslaughter. He appeals the judgment of conviction.

In his opening brief, appellant assigns as error various rulings on the admission and exclusion of evidence, and the giving of certain instructions. ▇ In his reply brief, appellant raises the additional contention that the admission into evidence of a tape-recorded statement taken in the manner hereafter described constituted reversible error under the rule stated in two United States Supreme Court decisions rendered subsequent to the filing of appellant's opening brief: *Massiah* v. *United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246]; and *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]. This latter contention is meritorious, hence there is no necessity to discuss appellant's other claims of error.

Early on the morning of March 3, 1963, Mark Bankendorf was driving north on Webster Street in San Francisco. As he proceeded, he heard screaming, and, upon stopping his car, ascertained that the sound was coming from an apartment building located at 1119 Webster Street. He was able to distinguish the words, ''Don't push me; don't push me.'' He looked up and saw what appeared to be two people struggling inside a window on the second floor of the building. He then saw a brown object which could have been a body fall out the window.

Kathleen Genins, a passenger in the Bankendorf car, had also heard the screaming and had looked toward the upper apartment at 1119 Webster Street. She saw a woman outside the window, hanging onto the window ledge and moving from side to side. She also saw what appeared to be the form of a man standing motionless inside the window. Although the man was directly behind the woman and in close proximity to her, he did not seem to be touching her and appeared to have his hands at his sides. Mrs. Genins then saw the woman fall backward to the ground.

Bankendorf sought a police officer and in a short distance encountered Officer Tull. He led Tull to 1119 Webster Street, where the officer examined the woman's body and radioed for an ambulance. Tull and Bankendorf then entered the apartment building and proceeded to the second floor, where they met appellant at the head of the stairs. When the officer asked appellant what had happened, he said, ''How is she?

Is she all right?'' Bankendorf also heard appellant say, ''It was my money, not her money.'' Tull then asked appellant why he had pushed the victim out of the window, but appellant did not reply. Appellant appeared to be intoxicated but not actually drunk.

Appellant then accompanied Tull out of the apartment building and the two men got into the radio car. In response to further questions, appellant stated that the victim was sitting on the window sill, and either fell or jumped. He also stated that he was 10 or 15 feet away from her at the time. Another radio car then arrived at the scene, and Tull was told that the victim was dead on arrival at the hospital. He relayed this information to appellant.

Officer Jackson then drove appellant to Central Emergency Hospital, where a blood sample was taken at approximately 4:30 a.m. Appellant's blood alcohol level was found to be .21. Jackson then informed appellant that he would be taken to the police station and booked for suspicion of murder. Appellant immediately asked if he could make a phone call because he wanted an attorney. Jackson replied that he could not do so then, but later he would be able to make a phone call.

Appellant was then taken to the Northern Police Station and subsequently to the city prison. At approximately 11 a.m., he asked the turnkey for permission to make a phone call for an attorney. The turnkey said he was busy at the time, but that appellant would be able to make the call later.

At 12:30 p.m., appellant was removed to an interrogation room, where he was questioned by the police and district attorney. Appellant was not informed of his right to consult an attorney or of his right to remain silent. This interrogation was recorded on tape without his knowledge; in it appellant stated that the deceased was his wife; that on the evening preceding her death, he and his wife had both been drinking heavily; that they returned to their apartment shortly after 2 a.m. and immediately became involved in a violent argument, during which his wife was screaming and running around the apartment. Although he insisted that he was on the other side of the room when his wife fell from the window, he admitted that he struck her two or three times before she climbed out the window. This tape-recorded statement was introduced into evidence as a part of the People's case and was played before the jury.

There can be no question but that the effect of the admission, that his wife's death was preceded by a violent quarrel during which he struck her repeatedly, was most

damaging to the appellant's cause. The jury which found appellant guilty of voluntary manslaughter was instructed that appellant was criminally responsible for his wife's death if "either by actual assault or by threats of death or by great bodily injury, [he] proximately caused the deceased to fall from the window either accidentally or by her voluntary act in an attempt to escape such assault, or threatened assault, and while she was acting reasonably as would a reasonable person under like and similar circumstances, under a fear of great and immediate bodily injury from [appellant]." Appellant's tape-recorded statement was in itself sufficient to support such a finding.

In *Massiah* v. *United States, supra,* the United States Supreme Court held that under the Sixth Amendment's guaranty of a criminal defendant's right to the assistance of counsel, the defendant's incriminating statements, elicited by subterfuge after his indictment and in the absence of his counsel, were inadmissible at his trial. In *Escobedo* v. *Illinois, supra,* the Court went a step further and ruled that an incriminating statement by a person in police custody (even though not formally indicted), developed during interrogation after he has requested and been denied the right to consult with counsel, and the police have not informed him after such request of his right to counsel and to remain silent, cannot be used against him, for the accused has been denied the assistance of counsel in violation of the Sixth and Fourteenth Amendments.

Judgment reversed.

Agee, J., and Taylor, J., concurred.

A petition for a rehearing was denied December 16, 1964, and respondent's petition for a hearing by the Supreme Court was denied January 13, 1965. McComb, J., and Mosk, J., were of the opinion that the petition should be granted.