**Martha MILLER, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 37522.**

Court of Criminal Appeals of Texas.

Feb. 3, 1965.

Rehearing Denied March 17, 1965.

John Peace, J. B. Langham, Carlos Cadena, San Antonio, for appellant on appeal only.

James E. Barlow, Dist. Atty., M. C. Gonzales and Richard M. Casillas, Asst. Dist. Attys., San Antonio, and Leon B. Douglas, State's Atty., Austin, for the State.

DICE, Commissioner.

Appellant was tried upon an indictment for murder with malice and convicted by the jury of murder without malice, and her punishment was assessed at confinement in the penitentiary for five years.

The state's evidence shows that appellant and her husband, the deceased, lived in an upstairs apartment of the Wheatley Courts at 207 Ira Aldridge Street in the city of San Antonio. On the night in question, while some boys were in front of the courts, talking, a shot was heard around 1 a. m.,

and appellant came down the stairs and stated that she had just shot her husband. The boys ran upstairs and found the appellant's husband lying in a hallway on his back, with a gunshot wound in the chest. A .22 calibre pistol was observed by witnesses, on a kitchen table in appellant's apartment, which pistol was later found nearby in a neighbor's yard.

An autopsy performed upon the body of the deceased disclosed a bullet wound in the right chest and showed that the cause of death was a bullet wound in the heart. A .22 calibre bullet removed from the body was shown by the testimony of a ballistics expert to have been fired from the pistol found near the scene of the killing.

It was further shown that, after the shooting, appellant stated at the scene, while crying and wringing her hands, that she "didn't go to shoot" the deceased and after the officers arrived appellant stated that the deceased "had jumped on her and she shot him."

Detective David Guerrero testified that when he talked to appellant at the scene he asked her if she would give him a statement and she replied that she would. He stated that he later talked to her at police headquarters between 1:30 and 2:00 a. m., and told her that she did not have to make a statement and that if she did it had to be voluntary and would be used as evidence against her. He further testified that after giving appellant the statutory warning, she made a statement to him which he reduced to writing on a typewriter and after appellant had read the statement she signed it in the presence of two witnesses.

The statement, which upon its face is shown to have been completed at 2 a. m., was introduced in evidence by the state, without objection, as State's Exhibit No. 2.

In the statement, appellant related that on the night of the killing, after her husband (the deceased) had seen her talking to another man at a lounge and told her to go back to her seat:

" * * * I told him to take me home since he did not want me to talk to any body, and he told me he was not ready to go yet. I then got up from the table and was walking out of the place when he followed me out. We got in the car and left, and we were arguing all the way. I asked him why he wanted to treat me the way he did in front of his people, and it was then that he struck me on the back of the head as I sort of bent down when he rasied his hand. This happened about two blks. from our house, and when we arrived home, he kept arguing and telling me he did not want me to talk to any body, and not to go back there again. I undressed, and went to bed, and about that time, an uncle of his arrived and they talked in the living room for a while. After his uncle left, the baby woke up and I went into the kitchen to fix a bottle of milk. He had just turned on the record player, and had it on too loud. I went and turned the music down as it was too loud, and he got mad at me and told me to get out of there and leave the record player alone. I went back to my bed room and took a small pistol out of one of the dresser drawers and went back to the living room. I met him in the small hallway, and just pointed the pistol at him and pulled the trigger. I was afraid he was going to beat me up again as he always does, and has done so many times. After I saw he was hurt, I called the police and told them I had just shot my husband. I then placed the gun on the kitchen table and ran out of the house and saw a lot of people just standing on the street. I told them I had just shot my husband, and I remember that some teenagers went up to the apartment. I was still standing outside when the officers arrived and placed me in a police car * * *."

Testifying as a witness in her own behalf, appellant related a married life with

the deceased, during which time he administered numerous beatings to her. In describing the events preceding the killing on the night in question, appellant stated that on their way home from the lounge deceased stopped and beat her, saying "that wasn't all I was going to get when we got home." When they arrived home she went to her bedroom and started to bed. The baby then began crying and she went to the kitchen to fix a bottle of milk. The deceased then started the record player in the living room and when he turned it up high she asked him to turn it down. He refused and when she started to turn it down the deceased advanced toward her. Appellant stated that she ran back to the bedroom because she was scared, and got the pistol out of a dresser drawer to frighten the deceased. As she was returning to the living room she met the deceased in the hall. She stated that when he kept coming at her after she told him to stop and just as he jumped on her the pistol went off. She denied any intention to shoot and kill the deceased.

Appellant admitted signing a written statement after her arrest but denied making certain statements contained in the one introduced in evidence by the state. Appellant stated that when she made the statement to the officer she was crying and upset. She further stated that before she signed the statement she asked to use the telephone and was going to call her mother to get in touch with a certain attorney; that she was told that after she signed the statement she would be allowed to make one telephone call, and she signed the statement.

The court in his charge instructed the jury on the law of self-defense, threats, and accident.

The court also submitted to the jury the issue as to the voluntary nature of appellant's written statement and instructed them that if they believed from the evidence or had a reasonable doubt thereof that the statement was not freely and voluntarily made, then they would disregard such statement and not consider it for any purpose whatsoever.

■ The jury, by their verdict, rejected appellant's defenses and we find the evidence sufficient to sustain the judgment of conviction.

Appellant predicates her appeal upon two points of error.

By the first point of error it is contended that the procedure followed by the trial court in admitting appellant's written confession in evidence did not afford her a reliable determination of its voluntariness and for such reason she stands convicted without due process of law and is thus deprived of her constitutional rights guaranteed by the Fourteenth Amendment to the Constitution of the United States.

Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, decided by the Supreme Court of the United States, and Lopez v. State, 384 S.W.2d 345, decided by this court, are relied upon by appellant in support of her contention.

■ The rule announced in Jackson v. Denno, supra, and followed by this court in Lopez v. State, supra, has no application to the present case, where the state's proof as to the voluntary nature of appellant's confession was not questioned when the same was offered in evidence by the state. See: Garrett v. State, Tex.Cr.App., 387 S.W.2d 53, opinion delivered January 27, 1965. The issue raised by appellant's testimony as to the voluntary nature of the confession after it was admitted in evidence was properly submitted to the jury under the instructions given in the charge.

■ By her second point of error, appellant contends that she was denied the assistance of counsel during her interrogation by the officer, in violation of the Sixth Amendment to the Constitution of the United States.

Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, by the Supreme

Court of the United States, is relied upon in support of her contention.

An examination of the record does not disclose that during her interrogation by the officer appellant was denied the assistance of counsel. While appellant testified that she requested permission to call her mother, no request was made by appellant that she be permitted to consult with counsel. The absence of such proof and the fact that appellant was warned that she did not have to make a statement differentiates this case from Escobedo v. Illinois, supra, where the accused requested and was denied an opportunity to consult with counsel. The point of error is overruled.

The judgment is affirmed.

Opinion approved by the court.