**People of the State of Illinois, Plaintiff-Appellee, v. Billie Harris, Defendant-Appellant.**

Gen. No. 50,919.

First District, First Division.

April 25, 1966.

 

Marshall I. Teichner, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and E. James Gildea, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

In a bench trial, defendant, Billie Harris, was convicted of attempted robbery and sentenced to the penitentiary for a term of 2 to 5 years. On appeal, defendant contends (1) that he was not proved guilty beyond a reasonable doubt, and "at best, an assault and battery were established," and (2) the failure of the police officers to advise him of his constitutional right to remain silent and of his right to counsel is reversible error.

The victim, Harrison Slinger, testified that on the evening of October 16, 1962, at about 10:15, while in the vicinity of 130th and Ellis Avenue, he met and spoke with Patricia Jones, an acquaintance of one year. While they were talking, defendant called the girl away from Slinger and talked with her for a short time. Later, at about 11 o'clock on the same evening, Slinger was physically assaulted by five or six men. "The defendant was one of them. I began to run, and as I was running they overtook me and one of the boys just ran right on over me and knocked me down and began to beat me in the face. And the others, they piled on and they cracked me and beat me, and then they let me get up. When I got up I saw Billie Harris standing right in front of me. He had a knife in his hand and he said, 'If you raise your hand or

174

make a move I'll cut your throat,' but he swore in saying it. I told him, 'Why are you all beating me?' I said, 'Five or six of you all beating me like this.' And he says, 'We'll kill you.' Billie Harris said, 'We'll kill you.' And they knocked me down again.

". . . Then they did start to beat me again and this time Billie Harris said, 'Get it.' I am down on the ground and they on top of me and I am screaming and then one them went in my pockets. I don't know which one. Then he went in my back pocket. I screamed and hollered and they were going through my pockets. Billie Harris told me to shut up, that he would cut my throat. . . . Another car drove up and stopped about five feet from where this was happening, and he had his headlights on, and I begged him, I said, 'Mr., please let me get in your car.' . . . He let me get in the back of his car and he drove me up Ellis Street to 131st Street. . . . I saw a squad car sitting right over the bus stop. I went there and told the officers what happened. . . . That was not the first time I had ever seen the defendant Billie Harris. I had seen him twice before; the first time about 10:30 p. m. that same date, in front of the food mart in Altgeld Gardens. The second time I saw him was at the west end of the food mart about 8 minutes later. . . . I rode around in the squad car at that time.

". . . The next thing I saw Billie Harris come from between the two project houses. I told the officers that that was the fellow that did it. Then the officer got out of the car and called Billie Harris and asked him what had happened and he replied that he had been to this girl's house. I told the officer, 'That's the fellow that just got through beating me and trying to hold me up.' When I said this, he was about two feet away from me. . . . I have seen People's Exhibit 1 . . . . It looks like the knife that was held by the defendant, Billie Harris, on the night in question. The next time I saw that knife was when the officers took it off of him in front of us where we were

175

sitting waiting. The officer that was in the jury room took the knife from him."

Police Officer McDowell testified as to Slinger approaching the squad car. "When I looked up and saw him he was bleeding around his mouth and nose, and his clothes were disarranged." He identified a knife found on Harris; "I took it from his pocket and I inventoried this knife subsequently."

Defendant then testified that he saw Slinger at about 11:00 p. m. on October 16, 1962, talking with Patricia Jones, a girl he had not seen in about a year or so. After a conversation with them, Slinger and the girl left. This was the last time defendant saw them until he was arrested. He denied being present at the assault. He denied ownership of the knife identified by Officer McDowell, and stated that the knife taken from him had a red and white pinstriped handle.

Defendant further testified that after Slinger and Patricia left, he went to a poolroom and stayed there about 15 minutes and then went to a tavern. He then went to a drugstore with a friend and had a drink, and went back into the poolroom. About five minutes after eleven, he went over "to some people's house at 938 East 133rd St., by the name of Bonds. I told the police where I had been. I didn't do anything but talk to Mrs. Bonds. I went to see if Mr. Bonds had to work the next day and she told me yes. . . . I stayed at Mrs. Bonds' house until about 11:15 or so. I didn't stay no more than ten minutes and just left and walked home."

In rebuttal, Police Officer Hughes testified that he questioned defendant "around 1:00 a. m. on October 17, 1962," and defendant told him that on the evening of October 16, "he was at a friend's house and refused to give me their name or address, and he said the person that was there was a married woman and he didn't want to get her involved."

176

Police Officer Hill, one of the arresting officers, testified he "found a black bone handled knife" on defendant and at the scene gave it to his partner, Officer McDowell. He further said, "The defendant at that time did not tell me that he went to a poolroom during the evening, returned to the poolroom and went to a drugstore, and from the poolroom to a friend's house."

Officer McDowell testified and again identified the knife. "I had occasion to put markings on the chipped side of the handle . . . and that is the knife. . . . and I got the knife from Hill." He stated defendant did not tell him that he had gone to a poolroom, a tavern, a drugstore or the home of Mrs. Bonds.

Defendant resumed the stand and testified, "At the time I was arrested, I told the officers where I had been. I was coming from a friend's house, Mrs. Bonds'."

█ Defendant's first contention is that the State failed to prove defendant's intent to commit robbery, and that "the conduct of the defendant as presented by the State's evidence establishes an assault and battery by an enraged and jealous man. The defendant was clearly out to get Slinger who was conversing with Patricia Jones, an important witness in this case whose absence is unexplained. . . . While this conduct, if defendant did participate as alleged, is surely reprehensible, it is in nowise an attempt to commit robbery under Ill Rev Stats 1963, Ch 38, Sec 8–4 and 18–1." To support his contention that the evidence here is not sufficient to prove an "intent" to take property from Slinger by the use of imminent force, defendant cites People v. Woods, 24 Ill2d 154, 180 NE2d 475 (1962), where it is said (p 158) :

> "Mere preparation to commit a crime, of course, does not constitute an attempt to commit it. We feel however that an attempt does exist where a person, with intent to commit a specific offense, per-

177

forms acts which constitute substantial steps toward the commission of that offense."

■ The elements of the offense of "attempt" are defined in Illinois Revised Statutes, 1963, Ch 38, § 8–4, as "a person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense." In People v. Murff, 29 Ill2d 303, 194 NE2d 226 (1963), it is said (p 305), "Criminal intent may be shown by circumstantial evidence."

■ ■ We consider the testimony of Slinger that some one of his assailants went through his pockets demonstrated acts "which constitute a substantial step toward the commission of that offense [robbery]," and although there is no testimony that any property was taken from Slinger, the act of going through his pockets by his assailants comes within the statutory definition of an "attempt." Also, although there is no direct testimony that defendant went through Slinger's pockets, "it is not essential that the defendant's participation in each element of the crime be established, it is sufficient to show that he aided, abetted or assisted in the commission of the crime." People v. Cole, 30 Ill2d 375, 379, 196 NE2d 691 (1964).

Defendant next argues, "The total evidence in this case shows that the defendant did not participate in the alleged beating of the complaining witness"; that the State only produced one witness to the attack, and "the unexplained absence of the testimony of Patricia Jones and of the identity of any of the other assailants must be set alongside of defendant's testimony."

■ We find this contention to be without merit. Slinger did not testify that Patricia was present at the assault. Apparently she was not a material witness. The

178

testimony of one witness alone, if it is positive and the witness credible, is sufficient to convict, even though the testimony is contradicted by the accused. (People v. Cox, 22 Ill2d 534, 539, 177 NE2d 211 (1961).) Here, Slinger had ample opportunity to observe the defendant, and his identification was positive. He testified, "The street was lit up; were right up under the light where these men came up to me and the defendant held a knife." The credibility of witnesses and the weight to be given their testimony is for the trial court, who saw and heard the witnesses testify, and the trial court resolved the conflict in testimony against the defendant. See People v. Boney, 28 Ill2d 505, 192 NE2d 920 (1963), where the court said (p 510):

> "Because a trial court as the trier of fact is peculiarly suited to determine questions of truthfulness, a reviewing court will not readily substitute its own conclusions, . . . unless the proof is so unsatisfactory as to justify a reasonable doubt of guilt."

Finally, defendant contends that "the facts show a violation of the express mandate of Justice Goldberg and the Supreme Court in People v. Escobedo, 378 US 478, and violate Gideon v. Wainwright, 372 US 335. A duty to apprise a litigant of his right to remain silent is no less present when he does or does not ask for an attorney, or regardless of his having previously retained legal counsel." An examination of this record shows nothing that could be considered as a confession or admission of guilt by defendant. He was represented by counsel at his arraignment and trial. Therefore, we find no violation of the Escobedo and Gideon decisions.

From our review of this record, we find that the proof was satisfactory, and defendant's guilt of an attempt to

commit the offense of robbery was proved beyond a reasonable doubt.

For the reasons given, the judgment of the Criminal Division of the Circuit Court of Cook County is affirmed.

Affirmed.

KLUCZYNSKI, P. J. and BURMAN, J., concur.