**Commonwealth v. Green**

*Jeffrey A. Brodkin, Assistant District Attorney,* for Commonwealth.

*Lewis Kates* and *Leonard B. Edelstein,* for defendant.

SPAETH, J., May 11, 1970.—

## NATURE OF THE CASE

This case is before the court on a motion to suppress an oral statement.

## FACTS

Defendant was arrested on August 8, 1969, and charged with murder. The homicide occurred on the 2100 block of Columbia Avenue, Philadelphia, evidently after defendant was involved in a fight with a group of boys outside the hardware store of defendant's brother, Nathaniel. When the police arrived, at about 7:20 p.m., defendant unlocked the door to the store and allowed the police to enter. As the police placed defendant in a wagon, an officer noticed that defendant's head had been cut, but when defendant was asked if he wished to go to the hospital, he said no. Defendant was taken to North Central Detective Bureau and then to the Police Administration Building at Eighth and Race Streets.

At the Police Administration Building, defendant was interrogated by Detective Cecil Willis, beginning at 8:30 p.m. After being warned of his constitutional rights to remain silent and to have an attorney, defendant proceeded to give an oral statement. During the course of the interrogation and before the completion of the statement, which was at 9 p.m., defendant said that his family had retained an attorney and that the attorney was going to come to the Police Administration Building.

In the meantime, at 8 p.m. one of defendant's sisters had called Irving A. Biener, Esq., and had asked

Mr. Biener to represent defendant and defendant's brother Nathaniel. Mr. Biener called the Homicide Division at the Police Administration Building and spoke with someone who identified himself as the "Chief" of homicide. When this person acknowledged that the Green brothers were in custody, Mr. Biener stated: "Well, I'm coming down to talk to them, I'll be right down."

Mr. Biener arrived at the Police Administration Building between 8:30 and 8:40 p.m. At the entrance, he identified himself to the officer in charge and said that he wanted to see the Green brothers. The officer said that he had to get "the okay" before he could permit Mr. Biener to go upstairs. After about 15 minutes, evidently after calling the homicide division, the officer permitted Mr. Biener to go upstairs. Upon arriving upstairs, Mr. Biener asked to see the Green brothers. After another 15 minutes, sometime said: "All right, let him go in and see Green."

This proved to be defendant's brother Nathaniel. After talking to defendant's brother for about half an hour, Mr. Biener came out of the interview room and asked where defendant was. This was at about 9:30 or 9:40 p.m. He was told that defendant had been taken to Hahnemann Hospital. (Detective Willis testified that at 9:16 p.m. he had ordered defendant taken to the hospital so that the cut on defendant's head could be treated.) Mr. Biener went to the hospital and was finally able to interview defendant for a few minutes in the hospital, where defendant "was on a table being attended to. . . ."

## DISCUSSION

As will have been observed from the foregoing, during the entire period that the police were questioning defendant, defendant's attorney was waiting, either

downstairs or outside the interrogation room, to see defendant. The Commonwealth contends, however, that defendant knowingly waived his right to have his attorney present when he made his statement. This contention cannot be maintained.

It may be that initially defendant had decided to make a statement, while his family sought to get him an attorney. His statements to the arresting officer, that "I'm the one that did the shooting," and "[L]et's get it over with," and his responses to the warnings given him by Detective Willis, before the detective's interrogation started, indicate that this was the case. However, there is no evidence that defendant decided to make a statement without the advice and in the absence of his attorney, knowing that his family had gotten him an attorney, and that the attorney was waiting outside the interrogation room to see him. To the contrary, the evidence is that defendant did not know that he had an attorney who was waiting to see him; hence, he could not knowingly waive his right to see the attorney. Accordingly, the case cannot be decided on the issue of waiver; the issue, rather, is whether the police complied with the procedures that it has been established must be followed incident to the interrogation of a person suspected of a crime.

In considering this issue, it should be noted at the outset that this is not a case of unequivocal denial of the right to see counsel, as was Escobedo v. Illinois, 378 U.S. 478 (1964). The court finds that the police did not conspire to keep defendant and his attorney apart. This finding, however, is not dispositive of the case.

When Mr. Biener notified the homicide division that he was on his way, the division was put on notice that defendant had an attorney; and when the attorney arrived at the Police Administration Building, and

the officer in charge at the entrance notified the homicide division that the attorney had arrived and wanted to talk to defendant, the interrogation of defendant should have been interrupted and defendant should have been told that his attorney had arrived and had asked to talk to him. Then, if defendant had chosen to proceed with his statement, without first talking to his attorney, the issue of waiver would have been presented.

Detective Willis, who interrogated defendant, testified that he did not know that defendant's attorney was present in the building. The court accepts this testimony. However, the detective may not operate in a vacuum. The "Chief" who spoke with Mr. Biener should have notified the detective of the attorney's impending appearance; at least, the detective should have been notified when the attorney did appear, so that he could notify defendant, which the detective testified he would have done.

The failure to give defendant such notice requires that defendant's statement be suppressed. This may be seen from the following statement in Miranda v. Arizona, 384 U.S. 436, 478-79 (1966):

"To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right to silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, [and] . . . that he has the right to the presence of an attorney . . . Opportunity to exercise

these rights must be afforded to him throughout the interrogation."

Here, such opportunity was not afforded.

### ORDER

And now, May 11, 1970, defendant's motion to suppress his statement is granted.