## JOSEPH F. NIXON *v.* STATE OF MARYLAND

[No. 71, Initial Term, 1967.]

*Decided December 15, 1967.*

The cause was argued before ANDERSON, MORTON, ORTH, and THOMPSON, JJ., and DIGGES, J., Chief Judge of the Seventh Judicial Circuit, specially assigned.

*William H. Zinman* for appellant.

*S. Leonard Rottman, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Charles E. Moylan, Jr., State's Attorney for Baltimore City,* on the brief, for appellee.

PER CURIAM.

This is an appeal by Joseph F. Nixon, from judgments of the Criminal Court of Baltimore (Carter, Joseph L., J.) that he was guilty of assault with intent to murder, robbery with a deadly weapon and carrying a concealed weapon. Sentences totaling thirty-five years in the Maryland Penitentiary were imposed.

He contends that his confession and certain hearsay testimony were erroneously admitted into evidence.

The victim, a gasoline station attendant, testified through a deposition that on November 22, 1965, two men entered his station for the purpose of robbing it; that one of the men, whom he identified as James W. Campbell, shot him in the spine with a revolver, thereby rendering him a paraplegic and preventing his personal appearance in Court; and that he was unable to describe or identify the other man.

Nixon was arrested at 3:45 P.M. on November 24, 1965. Sergeant Hirsh of the Baltimore City Police Department testified that Nixon was questioned from approximately 4:00 P.M. to 5:30 or 6:00 P.M. on the day of his arrest and again from approximately 10:00 to 10:30 P.M. that evening and he refused to give a statement. The next morning at approximately 10:30 A.M. he was again interrogated and thereupon signed a confession. The Sergeant testified that Nixon was advised of his right to have a lawyer, his right to remain silent and that whatever he said could be used against him. He further testified that Nixon was permitted to use the telephone during the first interview at which time he tried unsuccessfully to telephone his lawyer and his mother; that prior to the second interview he reached his mother by telephone but again was unsuccessful in reaching his lawyer; that his mother visited him shortly before the second interview; that at the second interview he was confronted by his common law wife, and, according to Sergeant

Hirsh, who arranged the confrontation, she urged him to co-operate with the police "because he [Nixon] was not the man that pulled the trigger."

According to Nixon, he was not advised of his right to remain silent or his right to a lawyer; that he was interrogated many times; that except for a cup of coffee, he was not allowed food or sleep until he signed the confession; that Sergeant Hirsh asserted that he, Nixon, would receive an easier sentence if he made a statement; that his common law wife told him that "she would lose her baby if I didn't make a statement;" that he was not allowed to contact an attorney; that Sergeant Hirsh threatened to hit him with a telephone book; and that he signed the confession because he did not want to see his common law wife lose her baby.

In rebuttal, Sergeant Hirsh testified that Nixon was given a meal between the first and second interviews; that the only reference made by the common law wife to her baby was her question to Nixon "why have you got me involved in this thing, I have a young baby to look out for." He stated that the purpose of confronting Nixon with his common law wife was to show him that the police, "were aware of certain things he had done concerning this offense." He conceded that the confrontation might result in Nixon making a statement. The officer denied threatening that the baby would be taken away from the common law wife and he denied threatening Nixon in any manner. He likewise denied telling Nixon "that if he made a statement it would go easier on him then or at the time of his trial." Nixon, also, told him on the morning he signed the statement that he had not slept the night before, that he was not hungry, that he was worried and wanted to give "a statement relative to this offense."

The Appellant concedes that the newly recognized safeguards surrounding the reception of confessions into evidence which were prescribed in *Miranda v. Arizona,* 384 U. S. 436, are not available to him since his trial was before their effective date. He argues, however, that *Escobedo v. Illinois,* 378 U. S. 478, is applicable and that the failure of the police to permit him to contact counsel renders his confession involuntary. While it is true that *Escobedo* holds that a confession is inadmissible

where the accused is prevented from conferring with counsel, the lower court was not required to believe the Appellant's assertions in this or in other respects. The police officer testified that Nixon was given opportunities to call an attorney whenever he sought to do so. Moreover, the evidence shows that prior to the second interview his mother spent forty-five minutes with him, during which time he could have requested her to obtain an attorney. Likewise, he could have asked his common law wife to seek an attorney. In any event, we are of the opinion that there was ample testimony to rebut his assertions regarding the denial of counsel and his other contentions with respect to the involuntariness of his confession.

We are likewise of the opinion that the circumstances under which the Appellant was confronted with his common law wife were not violative of his Constitutional rights in the posture those rights were available to him at the time of his confession and trial. The Fourth Circuit Court of Appeals had substantially the same question before it in *Stevens v. Warden*, 366 F. 2d 565 (1966) where the accused, Stevens, confessed to the crime with which he was charged promptly after the police had confronted him with his brother-in-law. Stevens contended that the police had threatened to lock up his brother-in-law unless he confessed and that this threat induced his confession. The police denied making such a threat, testifying that the confrontation was arranged to apprise Stevens of certain information they had received from the brother-in-law which implicated him in the crime. They conceded that the brother-in-law had informed Stevens that he should tell the truth. The trial court believed the police and found the confession to be voluntary. In affirming the denial of post conviction relief by the District Court, Chief Judge Haynsworth, stated (p. 568) :

> "We cannot hold this confession involuntary under the standards which we are to apply under the direction of *Johnson v. State of New Jersey*. Confronting Stevens with his brother-in-law for the purpose of convincing him that Whitaker [the brother-in-law] had, indeed disclosed what he knew apparently provoked the confession, but demonstration of the truth

of their representation was not an unfair tactic nor unlawfully coercive."

We find from the record that there was ample evidence to support the lower court's finding that the confession was voluntary.

We further find the Appellant's contention regarding the admission of so-called hearsay testimony to be without merit. It appears that after the Appellant had testified that his common law wife had told him during the confrontation that "she would lose her baby if I didn't make a statement," Sergeant Hirsh was called in rebuttal and permitted to state, over objection, that the only reference by the common law wife to the loss of her baby was the statement to Nixon—"why have you got me involved in this thing, I have a baby to look out for." The Appellant contends that this was inadmissible hearsay evidence. He misconstrues, however, in this instance, the law applicable to hearsay evidence. The clear purpose of permitting the officer to testify was to prove what statement regarding her baby the common law wife had actually made during the confrontation. The officer's testimony was not received as an assertion or representation of the inherent truthfulness of her statement; it was admitted simply to establish that the statement had been uttered. The officer's testimony, under the circumstances, was not violative of the hearsay rule. Professor Wigmore (IV Wig., *Evidence,* Sec. 1766, 3d. Ed. 1940), discusses this distinction as follows:

> "The theory of the Hearsay rule * * * is that, when a human utterance is offered as evidence of the truth of the fact asserted in it, the credit of the assertor becomes the basis of our inference, and therefore the assertion can be received only when made upon the stand, subject to the test of cross-examination. If, therefore, an extrajudicial utterance is offered, not as an assertion to evidence the matter asserted, but *without reference to the truth of the matter asserted,* the Hearsay rule does not apply. The utterance is then merely not obnoxious to that rule. It may or may not be received, according as it has any relevancy in the case;

616

but if it is not received, this is in no way due to the Hearsay rule.

\* \* \*

"The prohibition of the Hearsay rule, then, *does not apply to all words or utterances merely as such*. If this fundamental principle is clearly realized, its application is a comparatively simple matter. The Hearsay rule excludes extrajudicial utterances only when offered for a special purpose, namely, as *assertions to evidence the truth of the matter asserted*." Emphasis supplied.

*Judgment affirmed.*