**Palmer RAYFORD, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 40939.**

Court of Criminal Appeals of Texas.

Jan. 17, 1968.

D. Dalford Todd, Dallas, for appellant.

Henry Wade, Dist. Atty., Malcolm Dade, Joe K. Hendley, Kerry P. FitzGerald and William S. Mason, Jr., Asst. Dist. Attys., Dallas, and Leon B. Douglas, State's Atty., Austin, for the State.

## OPINION

WOODLEY, Presiding Judge.

The offense is robbery with firearms; the punishment, 50 years.

The indictment, returned April 26, 1965, alleged that appellant and Sammy Joe Jones acting together on or about March 5, 1965, made an assault upon Sophie Salverino and by assault and by violence and by putting her in fear of life or bodily injury and by using and exhibiting a gun, fraudulently took from the person and possession of Sophie Salverino without her consent and against her will one purse, one billfold and $15.00 in money.

The state having withdrawn its notice of intent to seek the death penalty and having given notice that it would not, the case came on for trial on September 9, 1966, and the jury having found appellant guilty, ap- pellant elected to have the same jury assess the punishment.

The evidence upon which the state relied for conviction is summarized in the state's brief as follows:

"On or about the 5th of March, 1965, Sophie Salverino and her husband Frank, were preparing to close their grocery store in Dallas, Texas. At about 10:00 p. m., her husband walked out to get into his car, Sophie to follow when the car had been started. As soon as Frank started to open the car door, Sophie saw a flash and heard a 'bang' and shouted, 'Oh my God! Frank has been shot.' Sophie went to aid her husband, taking her purse, which she al- ready had in her hand. While attempting to aid Frank, she placed her purse on the seat of their car, from where it disappeared. Four days later, the Appellant was arrested and made an oral statement which led police officers to the recovery of Sophie's purse."

Appellant's brief sets out the state's evi- dence as follows:

"The witness, Sophie Salvarino, testified for the State that her husband was shot in front of their grocery store, and that she lost a purse, and contents thereof, which had been placed in a truck nearby, but she did not testify that there was any direct contact with her person.

"J. L. Hoenburger, who worked for Sophie Salvarino in the grocery store, testi- fied about the condition of Mr. Salvarino, and Mrs. Salvarino in front of the store.

"The officers for the City of Dallas, Texas, testifying in this case testified about the arrest of the defendant and the sub- sequent interrogation and oral confession, which was reduced to writing, received from the said defendant, but no one testi- fied of having seen the defendant at the scene of the robbery, or connecting him with same, other than the defendant's state- ment in this case."

Mrs. Salverino testified that she had a purse in her hand when she went to the

car to aid her husband and put the purse on the car seat. Asked if she was scared she replied: "Certainly I was. Who wouldn't be?" She further testified that her husband died in her arms.

She identified the purse which was found five days later as the result of the oral statement or confession of appellant, in which he confessed to having participated in the robbery. She also identified the contents of the purse which had been found spilled on the ground near the purse which was hanging open in a tree. She testified that the purse she put on the car seat, and its contents, belonged to her and that she did not give appellant or anyone else permission to take her purse.

We are in accord with the state's contention that Mrs. Salverino did not relinquish possession of her purse and its contents by placing them on the car seat, and that one may be robbed of property not taken from his person. Ibeck v. State, 112 Tex.Cr.R. 287, 16 S.W.2d 232; Goodrum v. State, 172 Tex.Cr.R. 449, 358 S.W.2d 120.

Also, we find no merit in appellant's contention that Mrs. Salverino was not put in fear of her life or bodily injury. Cranford v. State, Tex.Cr.App., 377 S.W.2d 957.

Appellant's grounds of error 2 to 6 inclusive relate to the admission in evidence of the oral statement or confession of appellant and the evidence obtained as a result of such confession.

Ground of error No. 2 is: "The trial court erred in allowing, over the defendant's objections and exceptions, the testimony from state's witnesses as to the oral statement and confession made by the defendant in this cause."

Ground of error No. 3 is: "The court erred in finding that the statement received into evidence in this cause met the requirements of the law to make it voluntary and useful against defendant in a criminal case."

The robbery was committed March 5, 1965, and the statement was made March 9, 1965. Trial was on September 9, 1966.

The trial judge, upon the evidence adduced before him, found that the oral statement of appellant which implicated him as a principal in the robbery was given in accordance with the statutes of the State of Texas.

The applicable statutes at the time the statement was made were Article 726 C.C.P. 1925, now Art. 38.21 Vernon's Ann. C.C.P. (not materially changed) which provides:

> "The confession of a defendant may be used in evidence against him if it appear the same was freely made without compulsion or persuasion, under the rules hereafter prescribed."

and Art. 727 C.C.P. 1925, which as it related to oral confessions provided in part:

> "The confession shall not be used if, at the time it was made, the defendant was in jail or other place of confinement, nor while he is in custody of an officer, * * *. unless in connection with said confession, he makes statements of facts or circumstances that are found to be true, which conduce to establish his guilt, such as the finding of secreted or stolen property, or the instrument with which he states the offense was committed. * * *"

Article 38.22 of the 1965 Code of Criminal Procedure, in effect at the time the oral confession was admitted in evidence, contained the identical provision, but by reason of the inadvertent omission of a portion of the succeeding sentence of Art. 727, supra, (which related to the statement of a defendant unable to write his name, who signs it by making his mark), Art. 38.22 of the 1965 Code added to the above quoted provision of Art. 727 the following:

> " * * *, such statement shall not be admitted in evidence, unless it is witnessed by some person other than a

peace officer, who shall sign the same as a witness." [1]

The evidence from which the trial court concluded that the oral confession was admissible included the following:

About 4 or 4:30 P.M. on March 9, 1965 (four days after the robbery), Detective Parks received information from appellant's codefendant Sammy Joe Jones that appellant was with him when he committed the robbery and killed Mr. Salverino. Parks and his fellow officers then went to appellant's home to arrest him and took him to jail.

About 7:30 P.M. appellant was brought out of jail into the Homicide Office.

Detective Verlon Monaghen testified in part:

"Q. I will ask you if before anything was said, if you knew the whereabouts of any of the fruits of the crime involving Frank Salverino nad Sophie Salverino?

"A. No, I did not.

"Q. At that time, did you know there was a purse and a billfold missing that belonged to Mrs. Salverino?

"A. Yes.

"Q. I will ask you, sir, if Captain Fritz gave this Defendant a warning before a conversation was begun with him?

"A. Yes.

"Q. Will you tell the jury what warning was given this Defendant?

"A. He was advised that he didn't have to make a statement at all, but that if he did make one, it could be used against him on the trial of the offense, and he was advised that he had a right to an attorney. That's about all.

"Q. After that, did Captain Fritz, yourself, and M. G. Hall have a conversation with this Defendant?

"A. Yes.

"Q. Will you tell the Judge what that conversation was, please, sir?

"A. Captain Fritz talked with the Defendant and asked the Defendant if he wanted to tell what happened and the Defendant said he would be willing to tell what happened and Captain Fritz said to go back down to the room with the officers and tell them what happened.

"Q. Was this done?

"A. Yes, it was.

"Q. How did you go about taking down what he told you?

"A. I copied it down in longhand on a piece of paper and I typed it up after that.

"Q. You wrote it down in longhand first, yourself, and then you typed it up, yourself?

"A. Yes, I did.

"Q. Before you started talking to him, did you give him any type of warning?

"A. I told him the same thing Captain Fritz did, that is, that he didn't have to make a statement, but if he did, it could be used against him in the trial.

1. Art. 38.22 has since been amended and now provides, in part, that the statement made while defendant was in jail or other place of confinement or in the custody of an officer shall be admissible if

"(e) It be made orally and the defendant makes a statement of facts or circumstances that are found to be true, which conduce to establish his guilt, such as the finding of secreted or stolen property, or the instrument with which he states the offense was committed."

The act of the Legislature amending Art. 38.22 and other Articles of the 1965 Code of Criminal Procedure contains the further provision:

"Sec. 41. Saving Clause. Any confession admissible at the time it was made shall be admissible at any trial subsequent to the effective date of this Act." Acts 60th Legislature (1967) Ch. 659, pp. 1732, 1752.

"Q. After you had typed up this memorandum of what he told you, did you have a witness come in and witness taking the statement?

"A. Yes, I did.

"Q. Who was that person, please?

"A. He was a newspaper reporter, Warren Bosworth.

"Q. Is he a police officer?

"A. No, he is not.

"Q. Will you tell us what he told you regarding this offense—what he told you happened?

"A. He said he was down at the Goodluck hamburger place on Dolphin with a boy named Coffee where they met Sammy Joe Jones, Jr., and Sammy had an automobile and said he was going to make some money and wanted to know if they wanted to go along and they did go along and Sammy drove over to his girlfriend's house where he kept a pistol and picked it up and drove around awhile before he decided to hit the grocery store on, I believe, Scyene Road and parked the car behind the grocery store near some apartments and found that the grocery store was closed and Sammy said, 'We will wait until the people leave out,' and Sammy went beside the grocery store and had the gun and when the people came out of the store, Sammy fired the gun and then we ran back to the car where Coffee was in the car and Sammy came up a few minutes later with the woman's purse.

"Q. Where did he say they threw the purse?

"A. He said Coffee was driving and went on Hatcher Street and Sammy advised Coffee to throw the purse away and the best he could remember, it was a creek somewhere on Hatcher Street.

"Q. All this you're talking about, was that all reduced to writing?

"A. Yes.

"Q. In other words, you made written memorandum on what you just related to us?

"A. Yes sir.

"Q. And after you'd taken this statement or memorandum, did Warren Bosworth witness it, witness the taking of that?

"A. Yes, he did.

"Q. You say he told you that it was on a drainage ditch that Coffee had thrown the purse out, at a drainage ditch where it intersected with Hatcher?

"A. No, he told me a creek that intersected Hatcher near the projects, near the grocery store.

"Q. Did anything happen with this information?

"A. Well, some detectives and I later went out to look for this purse.

"Q. Was it dark by then?

"A. Yes, it was.

"Q. About what time did you all arrive at the place he described?

"A. I guess maybe around 10:00 o'clock.

"Q. Did you look for the purse?

"A. Yes, we did.

"Q. Did you find the purse?

"A. We did not."

On cross-examination:

"Q. And he didn't say that he'd like to talk to an attorney?

"A. No sir.

"Q. And no lawyer called on him?

"A. He was permitted one if he wanted one.

"Q. He didn't call anyone that you know of, did he?

"A. Not to my knowledge.

\*   \*   \*   \*   \*   \*

"Q. Tell us what warning you gave.

"A. The warning was written out on the statement.

"Q. What did you tell him?

"A. I told him he didn't have to make a statement, but that if he did, it could be used against him on the trial of the case and I advised him of the right to attorney and at the time he said he didn't want to see one.

"Q. Who all was present when you told him that?

"A. Warren Bosworth, the newspaper reporter, and Detective Hall and myself.

"Q. Detective Hall would have heard you say this?

"A. Yes sir.

"Q. And Mr. Bosworth would have heard you say this?

"A. Yes sir."

Captain J. W. Fritz testified in part:

"Q. Captain, at the time you talked with him, did you at that time know of any of the whereabouts of the fruits of the crime—the purse?

"A. No, we did not, not until I talked to him.

"Q. Did he tell you what had happened?

"A. Yes sir.

"Q. Prior to your having a conversation with him, did you give him any type of warning?

"A. Yes sir.

"Q. Tell what warning you gave him.

"A. I told him he didn't have to make a statement if he didn't want to, but any statement that he made could be used against him at the trial of his case and, also, that he could have an attorney.

"Q. Did he want a lawyer?

"A. Not at that time.

"Q. Did he tell you what happened?

"A. Yes sir, he told me about the robbery and told me about his part in it.

"Q. Did he tell you what happened to the purse that had been taken in the robbery?

"A. Yes, sir, he said that they had driven around off Hatcher and near the projects and threw the purse near a slough."

And on cross-examination he testified:

"Q. Did Palmer Rayford have a lawyer with him at the time?

"A. No.

"Q. Did you tell him he could have a lawyer if he wanted one?

"A. Yes sir.

"Q. Did he tell you he wanted a lawyer?

"A. He indicated he didn't want one at the time.

"Q. Did he tell you he didn't want one?

"A. I don't remember the exact wording. I just remember telling him he could have a lawyer if he wanted one and he indicated he didn't want one.

"Q. Well, he didn't indicate that he didn't want a lawyer, did he?

"A. He indicated he didn't want one.

"MR. HENDLEY: Your Honor, I believe he's arguing with the witness.

"THE COURT: All right.

"Q. What do you mean he didn't indicate that he didn't want one?

"A. He didn't make any indication that he wanted one.

    \*    \*    \*    \*    \*    \*

"THE WITNESS: I told him that any statement could be used against him and that he didn't have to make one, but that it could be used against him, and he could have a lawyer if he wanted one.

"Q. Did you tell him in his hearing that he couldn't talk to his mama?

"A. I didn't.

"Q. Did you tell him he was not going to talk to a lawyer?

"A. I didn't; I said he could have one any time he wanted to.

"Q. He didn't, did he?

"A. Not to my knowledge, but he could have."

Detective Preston Parks, the arresting officer, testified that on the morning of March 10, 1965, he and Captain Fritz had a conversation with appellant at the homicide bureau and further testified in part:

"Q. Will you tell what that conversation was about?

"A. The Captain told Palmer Rayford that we couldn't find the purse 'from what you told us,' and we needed to know again, and he said, 'Go out Hatcher to the drainage ditch—'

"MR. TODD: Will my objection go to this, Your Honor?

"THE COURT: Yes, sir.

"THE WITNESS:—and my partner said, 'which one?' And he said, 'The one at the end of Hatcher where Spring comes in by the graveyard.'

"Q. With this information, where did you go?

"A. We went to where Hatcher and Watts Walk comes together.

"Q. Did you go there?

"A. Yes sir.

"Q. Did you find the purse?

"A. Yes sir.

"Q. I will ask you to look at State's Exhibit No. 1 and ask you if you can identify that?

"A. That is the purse that we found out there.

"Q. The contents, are those part of the contents found out there also?

"A. Yes sir.

"Q. Will you tell the jury where you found this purse?

"A. This purse was hung in a tree where, as you go down Hatcher and turn right, there's a drainage ditch running parallel with Watts Walk and where they come together, you go up Watts about forty yards to this, where this purse was hanging in a tree.

"Q. Was it open or closed?

"A. It was open and the contents were spilled on the ground.

"Q. Will you look at State's Exhibit No. 2, and I'll ask you where you first found these?

"A. These credit cards and personal papers were in the billfold that *were* in the purse.

"Q. Were they a portion of the stuff that had fallen out of the purse?

"A. Yes sir."

After the court had ruled that the confession was admissible and it had been introduced before the jury, appellant was allowed to testify before the court in the jury's absence. He did not testify before the jury.

He testified before the court that neither Captain Fritz nor anybody else advised him that he did not have to make a statement if he did not want to, or that he could have a lawyer or that any statement he made could be used against him. Except for the fact that he was not taken before a magis-

trate before being interrogated, all of the testimony of appellant relating to the voluntariness or admissibility of the confession was controverted by the testimony of the officers.

■ Failure to take appellant before a magistrate did not render his oral statement inadmissible, no causal connection between such failure and the fact that the statement was made being shown. Dugger v. State, Tex.Cr.App., 402 S.W.2d 178; Ward v. State, Tex.Cr.App., 399 S.W.2d 567; Ferrell v. State, Tex.Cr.App., 397 S.W.2d 86; Nixon v. State, Tex.Cr.App., 406 S.W.2d 445.

Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, was decided after the confession was made but prior to the trial at which it was admitted in evidence.

■ We overrule the contention that the oral confession of appellant was not admissible under the holding of the Supreme Court in Miranda v. State of Arizona, supra, and Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, or under the Texas Statutes relating to oral confessions.

■ Our holding that the confession was admissible disposes of appellant's contention that the purse and contents found as a result thereof were not admissible under Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441.

■ The court in his charge to which no written objections were made instructed the jury to acquit the defendant unless they believed and found beyond a reasonable doubt that appellant:

"* * * was warned by the officers receiving such statements that he did not have to make such statement and if he did, it could be used against him in the trial of this cause, and that said statement was freely and voluntarily given by the said Palmer Rayford, Jr. without any force, threats, or coercion or otherwise on the part of the said officers receiving same, further that the said Palmer Rayford, Jr. was warned that he had a right to a lawyer if he wanted one and that he was accorded every right to have an attorney if he wanted one, and unless you find and believe beyond a reasonable doubt that these said factors existed prior to the time said oral statements were received, * * *."

The trial court did not err in overruling appellant's motion for instructed verdict of not guilty.

■ Ground of error No. 6 is: The Court erred in not including in its charge to the jury relating to the confession of the defendant that the police authorities must have warned this defendant that he could be silent and did not have to say a word, in addition to the charge given.

In view of the charge given and the absence of objection in writing, as required by Art. 36.14 V.A.C.C.P., this ground of error is overruled.

■ The remaining ground of error complains that at the hearing on the issue of punishment to be assessed the trial court erred in permitting testimony as to the prior probated sentence for Burglary received by appellant.

The evidence reflects that the period of probation had not expired. The evidence was admissible under the provisions of Articles 38.29 and 37.07, subd. 2(b), V.A.C.C.P. (1965).

The judgment is affirmed.

## DISSENTING OPINION

MORRISON, Judge.

I need not address myself to the question of the sufficiency of the warning given appellant prior to the giving by him of a statement or confession, because there is another and far more fundamental error in

this case which should not permit an affirmance of this conviction.

Robbery is one offense and theft is another. Facts showing theft will not support a conviction for robbery. There were a number of cases which demonstrated the distinction prior to Van Arsdale v. State, 149 Tex.Cr.R. 639, 198 S.W.2d 270. See Reese v. State, 91 Tex.Cr.R. 457, 239 S.W. 619; Harris v. State, 118 Tex.Cr.R. 597, 39 S.W.2d 888; Bryant v. State, 122 Tex.Cr.R. 385, 55 S.W.2d 1037; Flores v. State, 145 Tex.Cr.R. 134, 166 S.W.2d 706; and Alaniz v. State, 147 Tex.Cr.R. 1, 177 S.W.2d 965. Still other cases have distinguished robbery from theft from the person. See Hammond v. State, 121 Tex.Cr. R. 596, 49 S.W.2d 779; Anderson v. State, 132 Tex.Cr.R. 255, 103 S.W.2d 753; and Alsobrook v. State, 134 Tex.Cr.R. 322, 115 S.W.2d 668.

Since Van Arsdale v. State, supra, this Court has in Woods v. State, 153 Tex.Cr.R. 457, 220 S.W.2d 644; Polk v. State, 157 Tex.Cr.R. 75, 246 S.W.2d 879; Bell v. State, 167 Tex.Cr.R. 460, 321 S.W.2d 302; and Cassidy v. State, 168 Tex.Cr.R. 254, 324 S.W.2d 857; said, "In Van Arsdale v. State, 149 Tex.Cr.R. 639, 198 S.W.2d 270, we had occasion to point out that a distinction between robbery and theft from the person lies in the fact that in robbery there must exist the actual or threatened violence to the person antecedent to the robbery, which is not true of theft from the person." Polk v. State, supra. See also Gallagher v. State, 34 Tex.Cr.R. 306, 30 S.W. 557; Johnson v. State, 35 Tex.Cr.R. 140, 32 S.W. 537; Jarrott v. State, 96 Tex.Cr.R. 239, 257 S.W. 256; and Gonzales v. State, 136 Tex.Cr.R. 469, 126 S.W.2d 492.

The majority opinion quotes this unfortunate woman as saying she was scared. Of course she was scared, because her husband had just been shot, but there is not a scintilla of evidence that there was any actual or threatened violence to her. She ran to the aid of her dying husband, and on the way set her purse down because its presence in her hand hampered her in her efforts to assist her husband. If appellant's co-defendant took the purse from where the woman had placed it, he became guilty of theft, but certainly not robbery.

No matter how guilty this accused may be, he has a constitutional right to be tried for the offense which he committed and not another. The cases cited above are but a few in which this Court has steadfastly adhered to this principal.

I respectfully dissent to the affirmance of this conviction for the reasons stated above.

ONION, J., joins in this dissent.