**Elmer Glenn MILLER, Petitioner-Appellant,**

v.

**Harold J. CARDWELL, Warden, Ohio Penitentiary, Respondent-Appellee.**

**No. 21011.**

United States Court of Appeals, Sixth Circuit.

Sept. 10, 1971.

Elwood B. Hain, Jr., Detroit, Mich. (Court Appointed), for appellant.

Leo J. Conway, Asst. Atty. Gen., Columbus, Ohio, William J. Brown, Atty. Gen. of Ohio, Columbus, Ohio, on the brief, for appellee.

Before EDWARDS and MILLER, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

This is an appeal from an order denying a writ of habeas corpus by the District Court.

On May 5, 1963, Emma Austing, a widow past seventy-six years of age, lived, and had been living for many years, on her farm near Loveland, in Hamilton County, Ohio. Her husband, Joe Austing, had died about twenty-five years before.

Although she managed her farm, employed help, made plans to reconstruct buildings on the farm and supervised such work, sold property and collected rentals,—meeting many different people in the course of her business—she was mortally fearful of being alone at night and took unusual precautions for her safety. In her bedroom she kept a German police dog, and a large Shepherd dog, vicious toward strangers. Mrs. Austing also kept a loaded pistol on her dining-room table for protection against anyone who might break into the house at night.

On the night of May 5, 1963, the fears that had so long assailed this active, capable and intelligent elderly woman became a terrible reality.

On the next morning of May 6, 1963, Mr. Isham Ward, who worked for Mrs. Austing, arrived at the farm to milk the cows. As he went by the house, he noticed the doors of the sun porch were standing open. He stopped, glanced into the main part of the house and saw a disarray of overturned furniture, drawers pulled out, and rugs thrown back. He immediately returned home, asked his wife to call the police and to inform Mr. Reuben Chambers, who also worked for Mrs. Austing. Mr. Ward then returned to the scene and when Mr. Chambers arrived, they entered the house. They saw blood on the floor of the living room, and blood on the wall near the telephone, as well as blood on the telephone itself. There was blood in the east bedroom and in the west bedroom, and in the bathroom. Both of the watchdogs had been badly beaten and lay on the floor.

In one of the bedrooms, Mr. Ward and Mr. Chambers could see a form on the bed under the bed clothes, and when Mr. Chambers drew them back, they then saw Mrs. Austing. Her face and body down to her waist, were covered with blood. Her left eye was swollen shut. There was a big "knot" on her left forehead. In the blood on her chest was the mark of a heel and sole of a shoe. She was still alive but could not speak. She had put up a brave and terrible struggle against her assailants. Battered and bloody, she had fought them off, trying to get to the telephone to summon help, finally getting the telephone in her hands—all to no avail because somebody had cut the telephone wires on the outside of the house.

Deputy Sheriff Schulte, who arrived in a police cruiser shortly afterward, said that when he looked at Mrs. Austing, he could hardly tell that she was a human being. Her face looked like a piece of raw beefsteak. An ambulance soon arrived and Mrs. Austing was placed on a stretcher and rushed to Our Lady of Mercy Hospital, where it became evident that her throat was swollen to such an extent that an emergency tracheotomy became necessary. Two weeks later, she died of a massive pulmonary embolism. The state's proofs showed that the beating received by Mrs. Austing on the night of May 5, 1963, was the cause of her death.

As soon as the police started to investigate, immediately after Mrs. Austing was taken to the hospital, they made some important discoveries. They learned that about six o'clock on the evening of the day on which Mrs. Austing was fatally beaten, she had two visitors—both men. Mrs. Anna Ward, who worked for Mrs. Austing performing such services as preparing her noonday meals, as well as general cooking and housework, had been asked to come with her husband and children for Sunday dinner about 1:30, which they had done. Mrs. Ward remained with her for the afternoon, and about 6:00 or 6:30 in the evening, appellant Elmer Glenn Miller, whom she knew, and another man, whom she did not know, came to the door and asked if Mrs. Austing

were at home. Mrs. Ward told him to wait a moment but, when she turned and went in to ask Mrs. Austing whether she wanted to see them, appellant Miller and the other man followed her into the living room. When she told Mrs. Austing that Miller wanted to see her, she said, "Well, all right."

Appellant Miller started talking to Mrs. Austing and he argued with her about buying a house from her. His voice kept getting louder. He said he wanted to pay her $500 in cash. The other man sat in a chair saying nothing. Some of the points of the argument of appellant Miller and Mrs. Austing are unclear, but she replied to this statement that he had $500 in cash to pay her, by saying: "I got a permit to get the property fixed up." Whereupon, Miller said in a voice getting louder and louder, "Well, I don't believe you." Mrs. Ward then intervened and said, "Well, she has got the permits because my husband went and got them." Miller then said to Mrs. Ward, "Why don't you shut your goddam mouth? It is none of your business." Mrs. Ward replied, "Well, she is an old lady." At that time the telephone rang and Mrs. Ward went to answer it. Appellant Miller still remained in the living room, talking so loud that it interfered with Mrs. Ward's conversation. When she had to end it, because she couldn't hear, Miller and the other man were leaving and, as they went out, Miller was mumbling to himself.

Mrs. Ward left Mrs. Austing's home about 7:30 in the evening. Mrs. Ward was later asked whether she knew that Mrs. Austing had a safe, and she replied that she did, and that it was kept in the closet of her bedroom. Mrs. Ward also testified that she had known appellant Miller previously, because he had lived near the Wards for about two years, and she had seen him often; but she had never before seen the man who came that day to Mrs. Austing's house with Miller, and who afterward proved to be Lester Swiger.

Some days after the fatal beating of Mrs. Austing, the police received word that a safe had been located in a ravine on Ibold Road, some distance from Mrs. Austing's home. They found the safe in the ravine, together with a pair of wooden shoes that had been taken from the Austing house. They also found a wedge. The safe had been charred by fire.

Addison Crofton testified that about midnight on May 5, 1963, appellant Miller, whom he knew, came to his home on Newton Road, knocked on the door, woke him up, and Crofton then led him into the house. Miller told him he wanted to borrow a sledge hammer and a couple of wedges. Crofton had these tools for splitting logs when he worked in the woods. Miller told him that he wanted the sledge and the wedges for "some chunks he wanted to bust up." Crofton had them in a little building; he went out, got them, and let Miller have them, telling him that he might start back cutting wood and logs again, and to be sure not to lose them. Miller told Crofton he would bring them back the next day; but Crofton never got them back. The wedge that the police found in the ravine with the safe was identified by Crofton as one of the wedges Miller borrowed from him that night.

Appellant Miller took the witness stand in his own defense on the charge of murder of Mrs. Austing in his trial in the Common Pleas Court of Hamilton County, Ohio. He testified that on May 5, 1963, the day of the fatal beating of Mrs. Austing, he was with Lester Swiger the entire day. He stated that he drove his car over to Mrs. Austing's that afternoon; that Swiger was with him; that Mrs. Ward came to the door when he knocked; that he and Swiger went into the house; that he had a talk with Mrs. Austing about buying a little house nearby, and that Mrs. Austing told him she would consider what he offered for the place and would let him know in a few days. Appellant Miller testified that after this conversation with Mrs. Austing, he and Swiger left, and he drove

back toward Milford; that, later, after dark, he saw Curtis Bellamy in Milford; that Bellamy got into the car; and that Miller, driving his car with Swiger and Bellamy, drove back to Mrs. Austing's house.

Appellant Miller further testified that Swiger had seen a number of saddles when he and Swiger first went to the Austing house; that, at the time, Mr. Ward was carrying them into the barn; that Mrs. Austing had the saddles for the ponies and horses in a corral, where people could come and ride; that Swiger wanted to steal the saddles; that they drove the car down to a trailer where the saddles were; that at the time they went to the Austing house, appellant had the idea that they were going to take the saddles; that they were going to steal them; that appellant, himself, "grabbed the saddles, maybe two or three bridles or halters," and threw them on the back floor or the seat; that Swiger and Bellamy went inside the Austing house while appellant Miller remained outside; that later appellant saw the safe of Mrs. Austing just outside the door of her house; that appellant then helped Swiger and Bellamy move the safe over to his car, and helped lift the safe into the back of the car. Appellant said he then drove back on the highway with the safe in the back end of the car. The safe, he said, was later rolled out of the car into a ravine. One of the other two men with appellant thought he knew somebody who might have a blow torch. As appellant testified: "Well, the party he thought had the torch, didn't have the torch, so the next thing was to come up with something to open the safe." Appellant then drove over to Newtown where he knew Addison Crofton, and he got a sledge hammer and two wedges from him. Then they drove back to where they had left the safe. The safe had cast iron hinges. Appellant said he and Swiger changed off, one holding the wedge and the other, swinging the sledge hammer. It was easy to knock off the hinges. He finally knocked off the door of the safe.

Bellamy, Swiger and appellant then went through the safe, and found about twenty-four to twenty-five hundred dollars. They "supposedly" split it three ways. The first counted out was $700, which apparently was given to Bellamy. Before they left the safe in the ravine, they poured gasoline or kerosene over it, and left it flaming. When appellant was asked whether the gasoline was poured on the safe and ignited so that "it would take any fingerprints off of the safe," he answered: "It wasn't an idea of mine to do it." Appellant stated he "couldn't say" whether the gasoline had come from the tank of his automobile, but "I did have a can in the car." He said that as he was "pulling away," he saw the flames; and he then drove out of town with Bellamy and Swiger in his automobile. However, when they had driven some distance, Bellamy said he wanted to get out and go back to Milford, and so appellant stopped the car and let Bellamy out. Appellant and Swiger then drove on, and got to Chillicothe the next day, and spent some time drinking there. From Chillicothe, they drove across the river into West Virginia that evening. They had the saddles and a rifle and pistol which they had stolen from the Austing home, in the back of the car.

Appellant had kinfolk in West Virginia, and they sold the saddles there. Appellant testified that he hid the pistol which they took from the Austing house, in the woods belonging to one of his relatives; and that Swiger bought a gun from one of his relatives for $10.00. Appellant and Swiger then drove into the State of Virginia, near Washington, D. C.; then through Baltimore and to Philadelphia, where they headed west on the Pennsylvania Turnpike, arriving about two weeks later in California, where they were arrested on a routine check-up by the Los Angeles Police Force. Appellant claimed he was not in Mrs. Austing's house at the time of the robbery, and had no knowledge of what took place inside the house at that time.

On cross-examination, appellant admitted he knew Mrs. Austing before the fatal night; that he had lived in one of her cottages and had worked for her in 1960, 1961, and 1962, shingling two houses for her, and helping to tear down two other houses, and working as a carpenter for her during those years. Appellant claims that, although he drove the car on the fatal night, accompanied by Swiger and Bellamy, he was so drunk that he was not aware of anything except taking the saddles, then falling asleep and, afterward, waking up, helping lift the safe into the car, going to get the sledge hammer and wedges, knocking the door off the safe, getting the money in the safe, dividing it, and then driving to Chillicothe where he and Swiger continued drinking.

Appellant Miller's entire contention that he did not know anything about the fatal beating of Mrs. Austing was based on the claim that he was so drunk he could not recall every incident and "had no business driving that car." It is here to be observed that, regardless of his claimed stuporous drunkenness, appellant admitted that he had driven Swiger and Bellamy to Mrs. Austing's home; that he, together with the others, had intended to steal the saddles and did steal them; that he saw the safe on the concrete slab just outside the door of Mrs. Austing's house sometime before midnight; that he helped to lift the safe into the back of his car, and then drove with Swiger and Bellamy to the ravine where they left the safe; that he, alone, drove over to Addison Crofton's house about midnight to borrow a sledge hammer and wedges in order to smash the hinges of the safe door and break it open; that he drove back to the ravine where he and Swiger used the sledge hammer and wedges to break open the safe; that they got about $2,500 in cash from the safe; that they divided it among them; and that appellant and Swiger, after letting Bellamy out, drove to Chillicothe; that from Chillicothe they drove to West Virginia, where they sold the saddles, and then drove on eventually to the Pennsylvania Turnpike and to California.

Whether, in the light of the foregoing, appellant was so drunk that he did not know that Swiger and Bellamy made their way into Mrs. Austing's house near midnight, and did not know of, or hear of, anything that happened in the house during the fatal assault on Mrs. Austing, was, under the circumstances, a question for the members of the jury to determine, and a question that could well arouse their misgiving or disbelief.

In addition to appellant's own testimony, there was further evidence of the complicity of appellant and Swiger in the crime. After Swiger and appellant Miller had been arrested by the Los Angeles police, Lieutenant Herbert Vogel of the Sheriff's Office, and Detective Ernie Taylor of the Prosecutor's Office of Hamilton County, Ohio, went to Los Angeles, and, after an interview with Swiger and appellant Miller, which will be discussed hereafter, the officers brought Swiger and Miller back to Ohio. Lieutenant Vogel testified that when he and appellant Miller were en route from Los Angeles to Cincinnati, before changing planes in Chicago, appellant became quite talkative after their meal, and stated to Vogel that "he intended to get the money off this woman," but, he said, "I didn't want those guys to kill her." And he said, "What we got out of it, it wasn't worth taking this lady's life."

Lieutenant Vogel's testimony continued: "And I asked him how he got rid of the saddles so fast, and he said: 'Well, they were all friends of mine up in West Virginia.' He said, 'I just went to my cousin's house.' I think he said, 'Orvie Powell's house; and he arranged for us to dispose of these saddles so that we could get the best price for them;' and he also stated that he thought they got $75.00 for one saddle and $50.00 for another; and then he said he was glad it was all over. It was on his mind. It was worrying him, and he told me how he was picked up in Los Angeles, what circumstances came about causing his arrest in Los Angeles.

"Q. That was on the plane?

"A. That was on the plane; yes, sir."

On arrival at headquarters in Hamilton County, Ohio, Lieutenant Vogel stated that he and Mr. Taylor from the Prosecutor's Office, had a conversation with appellant Miller, Swiger, and Bellamy. It was the first time appellant had seen Bellamy since the night of the robbery and fatal assault. On cross-examination, Lt. Vogel was asked:

"Q. And Miller said to Bellamy, 'You might as well tell them. They know all about it' Or words to that effect?

"A. Or words to that effect."

In addition, Detective Jerry Taylor of the Office of the Prosecuting Attorney for Hamilton County, Ohio, testified that on May 31, 1963, he saw appellant Miller, Swiger and Bellamy at Police Headquarters in Ohio, on Hamilton Avenue; that he had a conversation with Miller about the saddles; that Miller stated he had gone to Kingswood, West Virginia, and sold some of the saddles there; that he also sold some of the saddles at Brewston Mills, and had left a 22-calibre revolver with Ray Everly at Ashburn, Virginia; that one of the saddles was left with Orvie Powell in Kingswood, and a saddle was sold to Ben Chidister; that there was a saddle and a rifle with a bayonet left at Roy Real's home in Auburn, Virginia. Detective Jerry Taylor then testified that he and Detective Ernest Taylor went to Kingswood, West Virginia, where they recovered a saddle from Orvie Powell, and another saddle from Ben Chidister; and that they then went to Brewston Mills and talked to Ray Everly, who gave them the rifle with a bayonet, which he had kept in his feed store. This rifle with bayonet was just like the one which had hung outside Mrs. Austing's kitchen door; that the two detectives then went to Ashburn, Virginia, where they talked to Roy Real, and he turned over to them a 22-calibre revolver. This 22-calibre revolver was the very gun which Mrs. Austing always kept on her dining-room table for protection against robbers. On June 4, 1963, when Detective Taylor saw appellant Miller, Swiger and Bellamy, he showed the items to all of them, and Miller identified two of the saddles and the hand gun as those sold to Ray Everly, as well as Mrs. Austing's gun which Miller had left at Roy Real's house in Ashburn, Virginia. In Miller's own testmony, he said that he had hid Mrs. Austing's gun in the woods near the home of one of his relatives.

■ We proceed, then, to the question upon which appellant most strongly relies. After Swiger and appellant Miller had been arrested by the Los Angeles police, Lt. Herbert Vogel of the Sheriff's Office, and Detective Ernie Taylor, of the Prosecutor's Office of Hamilton County, Ohio, went to Los Angeles and on May 29, 1963, interviewed both Swiger and appellant. It is this interview, the manner in which it was taken by recording, and its admission into evidence during his trial, that form the bases of appellant's claim that he was convicted in the court of Hamilton County, Ohio, by improperly admitted hearsay evidence and was deprived of his right, under the Sixth Amendment, to confront witnesses against him, and of his Fourteenth Amendment right to due process.

The recording was a statement, made in appellant's presence, by his co-defendant, Lester Swiger, (who was tried separately) to Lt. Vogel and Detective Taylor. Appellant had been advised of his right to maintain silence, and also that anything said by him could be used against him. However, the statement by Swiger was orally ratified by appellant, as appears from the recording. The trial of appellant, subsequent to the recorded statement, took place, and was concluded by his sentence on June 3, 1964. The rule relating to custodial interrogation in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, applied to trials after June 22, 1964, and the rule in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, applied to trials after June 13, 1966; so that nei-

ther the standards in *Escobedo* nor *Miranda* are applicable to the instant case.

The following is the recording insofar as is pertinent to the issue raised by appellant:

"This is an interview being conducted on May 29, 1963, in the Los Angeles, California, Police Department.

"I am Ernest Taylor, Special Investigator for the Hamilton County, Ohio, Prosecutor's Office.

"Also present is Lt. Herb Vogel of the Hamilton County Sheriff's Office.

"Also present at the interview is:

"Taylor: Talk into the mike and tell us your name.

"Miller: Elmer Glen Miller.

"Taylor: How old are you, Mr. Miller?

"Miller: 46.

"Taylor: And where do you live?

"Miller: 8531 Wooster Pike.

"Taylor: And will you talk into the mike and tell us your name?

"Swiger: Lester Eugene Swiger.

"Taylor: And how old are you, Mr. Swiger?

"Swiger: 28 years old. R. R. 1, Batavia, Ohio.

"Taylor: I call your attention to an incident that occurred at the residence of Mrs. Emma Austing on or about May 5, 1963, at her residence. Will you tell us about that?

"Swiger: Yes. I went to drinking that morning and I went to this woman's house—I don't know her name—and, with Elmer Glen Miller, and he was talking about buying a cottage, and this woman wouldn't agree to it right there. So we went out and we got to drinking more and we picked up another boy and went back.

"Taylor: You say you picked up another boy?

"Swiger: Yes.

"Taylor: Where did you meet this other boy?

"Swiger: In Milford, Ohio.

"Taylor: What is his name?

"Swiger: Curt.

"Taylor: Do you know his last name?

"Swiger: No. Then we went back to the woman's house; we went into the woman's house and—

"Taylor: Why did you go back to the woman's house?

"Swiger: To get a safe.

"Taylor: Was this arranged? Did someone know about that safe?

"Swiger: Yes.

"Taylor: Who?

"Swiger: Elmer Miller knew the safe was there.

"Taylor: O. K. Go ahead.

"Swiger: Then we, me and Curt went in the house and Elmer stayed out of the house. We got in and then he come into the kitchen later on. And this Curt told me to tell the woman to lie down on the floor. I told her to lie down on the floor. She wouldn't do it, went screaming and fighting and ran running into the other room, and Curt grabbed her by the arm. The woman fell, I think; anyhow, I went on into the bedroom to find the safe. I found the safe and I come back out and this boy had a pistol. He told me he was trying to get the combination off this woman and she wouldn't give it to him. He slung her up against the wall and she hit the floor. I run back in, tried to get the safe out. I got it out of the closet, pushed it to the front room, and then I—the woman was lying there in the room; I carried her into the front room and laid her down. I pushed the safe on to the door and me and this other boy threw a rug over and pushed it to the door.

"Taylor: Did somebody try to tie her?

"Swiger: Yes, tried to wrap a rope around her. I did, and then I pushed the safe out, me and this Curt pushed

the safe out to the door where Elmer helped us load it in the car and take the safe to the woods, and he went to borrow—

"Taylor: When you say 'he' who do you mean?

"Swiger: Elmer Glen went to borrow a chisel and a hammer and we opened the safe and got the money out of it. We went on the road and split the money. We split the money on the roadway."

The recording concluded as follows:

"Taylor: * * * Mr. Miller, [appellant] this recording that you just heard Lester give us, is that all essentially true what he said?

"Miller: As far as I know, as drunk as I was that night. I will say it that way.

"Taylor: It is the truth?

"Miller: As far as I know as drunk as I was. I don't recall every little incident. No man would, and I was drunk and I had no business driving that car.

"Taylor: But, essentially, I mean, everything he said is the true statement?

"Miller: Yes."

Before proceeding to the discussion of the recorded statement of Lester Swiger, made in appellant's presence, which appellant claimed was improperly admitted hearsay evidence, and which resulted in his conviction of murder, in derogation of his rights under the Sixth Amendment to confront witnesses against him, and of his right to due process under the Fourteenth Amendment it should be emphasized that appellant was the chief witness in his own defense in his trial for murder in the Hamilton County Court of Common Pleas.

In reading and rereading the transcript of testimony, and considering the arguments of appellant and his counsel with regard to the claimed improper admission of hearsay evidence of the recording of Swiger's statement, and appellant's oral ratification of it, and appellant's contention that such improperly admitted hearsay evidence resulted in his conviction of murder in derogation of his constitutional right of confrontation of witnesses against him, and of deprivation of due process, a strange air of unreality seems to pervade the case. Upon reflection, one realizes that this air of unreality results from a seeming forgetfulness on the part of counsel that appellant had actually been a witness in the case, as well as a forgetfulness of what his testimony was. Let us, then, at this point, recapitulate what he said.

Appellant's testimony included the admission that he had known Mrs. Austing for some years; that he had lived in a cottage on her property; that he had worked for her as a carpenter for approximately three years—performing such work as shingling various houses for her, and "tearing down" other houses during approximately three years just prior to the robbery and fatal assault upon her; that he drove Swiger and Bellamy (who were also convicted of Mrs. Austing's murder) over to the Austing home sometime before midnight on May 5, 1963; that he further admitted he and the others intended to steal the saddles which he and Swiger had seen when they were at the Austing farm earlier the same day; that appellant took the saddles and threw them into the back seat of his car; that he helped remove the safe from the slab outside the door of Mrs. Austing's house; that he then helped to lift the safe into the back of the car; that he then drove the car, with Swiger and Bellamy beside him, over to a ravine where they left the safe; that appellant Miller, Swiger and Bellamy went to see a man that they thought had a blow torch, but they found the man did not have such a torch; that appellant then drove to Newtown about midnight, where he secured a sledge hammer and wedges from Addison Crofton on the pretense that he wanted to split some wood; that he brought the sledge hammer and wedges back to the ravine; that appellant and Swiger used the sledge hammer and wedges to knock off the hinges and break

open the door of the safe; that appellant and the others ransacked the safe, finding approximately $2,500, which they divided; that they drove away, stopping to let Bellamy out; that they continued driving on to West Virginia where they sold the saddles; and then drove eventually to Los Angeles where they were arrested by the police.

We come, then, to the claimed error in the admission in evidence of the recorded statement of Lester Swiger made in the presence of appellant Miller and ratified by appellant.

Before the recording was admitted in evidence, the judge of the Court of Common Pleas hearing the case, after listening to the recording, instructed the jury as follows:

"THE COURT: The State alleges that the defendant, Swiger, who was first named in this indictment, together with the defendant now here on trial, Elmer Glenn Miller, made certain statements to the police officers which were recorded, these statements being statements against interest with respect to both these persons.

"Now, it appears that the defendant, codefendant here, Swiger, related this conversation or a great deal of it, so that his voice will be heard on this record.

"Now, you are instructed and cautioned that whatever this codefendant, Lester Swiger, said is not evidence in this case in any way and must not be considered as evidence in this case against this defendant, because Swiger is not on trial. This defendant is on trial.

"If you would take into consideration anything that Swiger said, standing alone, about what he or what this defendant did, that would be hearsay testimony and it is not competent testimony, and you would not consider it.

"However, it is further alleged by the State that this defendant in connection with this same conversation approved or adopted in some way in his conversation, whatever was said or portions of what may have been said by Swiger, as his own statements.

"Now, if you find that to be true, and I will instruct you further on this later on, that the law requires that I tell you now so that it is fresh in your memory, and you recognize the importance of it, if you find in any way as claimed by the State that Mr. Swiger did or that this defendant, Miller, did accept statements made at this time by Swiger as his own statements, approved of what Swiger said, or concurred in some way what Swiger said, so that you could find that he, himself, made those statements, then you have the right to accept it as evidence and give to it such weight as you feel it is entitled to receive at your hands when you come to consider this case with all the evidence before you, in determining finally whether this accused has been proven guilty beyond a reasonable doubt as the State contends.

"Now, with that explanation and that instruction, this record will be played to you now."

The recorded statement of Lester Swiger, which was played to the jury, and which has heretofore been set forth, is in accord with appellant's own subsequent testimony, except in two instances. Swiger in his statement, in answer to the question: "Did someone know about the safe?" answered: "Elmer Miller [appellant] knew the safe was there." Furthermore, Swiger, in telling how the robbers entered Mrs. Austing's house that night, said: "Then we, me [Swiger] and Curt [Bellamy] went in the house and Elmer [appellant] stayed out of the house. We got in and then he come into the kitchen later on." The kitchen was the first room, adjoining the sun porch, which one entered in going into the house.

When appellant Miller heard the recorded statement by Swiger, Miller was asked by Detective Taylor: "Mr. Miller, this recording that you just heard Lester give us, is that all essentially true what he said?" Miller's reply

was: "As far as I know, as drunk as I was that night. I will say it that way."

"Taylor: It is the truth?

"Miller: As far as I know as drunk as I was. I don't recall every little incident. No man would, and I was drunk and I had no business driving that car.

"Taylor: But, essentially, I mean, everything he said is the true statement?

"Miller: Yes."

Later, Miller, in his testimony on his trial, stated that he did not know anything about Mrs. Austing's safe, or where it was; and that he did not go into the house that night, after Swiger and Bellamy had gone in.

Swiger's statements with regard to appellant's knowledge about the safe in Mrs. Austing's home and that Miller had entered the Austing house that night, were not matters, the facts of which were affected by drunkenness. He admitted to Detective Taylor that what Swiger said concerning his knowing about the safe in Mrs. Austing's house was true. He later said in his own testimony at the trial, that he did not know about the safe. This matter of the safe was not a detail that he could not remember because of drunkenness. To the same effect, was the question of appellant's entering the Austing house that night. As counsel for the State says: "Anyone who can understand our language must find adequate basis in the first three lines of this statement to make it clear that Swiger and Curt (Bellamy) went into the house and Elmer (Miller) stayed out of the house. After they (Swiger and Curt) got in then he (Elmer) came into the house. This is the only interpretation reasonably to be placed on these words." It was for the jury to determine the fact, which it did under proper instructions.

The trial court exercised unusual precautions that appellant's constitutional rights be safeguarded, and was guilty of no error in the admission of evidence. Much is made of the claim that appellant was deprived of his right to confront his co-defendant, Swiger. During his trial, appellant made no such contention, and this argument was raised for the first time on appeal before the Supreme Court of Ohio.

In this regard, that court said that the recording was a voluntary confession and, as such, there can be no question raised as to confrontation. Appellant, as the Supreme Court of Ohio said, never denied that the admissions used against him were voluntary.

In State v. Swiger, 5 Ohio St.2d 151, 160, 214 N.E.2d 417, 424, the court declared:

"The voluntary confession of an accomplice made in the immediate presence of an accused is admissible as evidence against the accused even though the accomplice and the accused were under arrest, if the accused ratifies the confession or adopts it as his own. Whether there is such an adoption or ratification is a question of fact for the jury to determine after proper instructions from the court. The record shows that such instructions were correctly given and there is no error in the introduction of recording No. 1 [1] into the record.
\* \* \*

"At no time during any of the proceedings did any of the defendants deny that the admissions used against them had actually been made as represented by the recordings. At no time during any of the proceedings did any of the defendants deny that the admissions used against them had been made voluntarily."

The court concluded that the record indisputably supported the view that the confessions involved were in fact made voluntarily.

Appellant relies on Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, as governing the voluntariness of

---

1. The recorded statement of Swiger, and appellant's ratification of it.

appellant's ratification (as a confession) of Swiger's statement. However, on the trial, appellant's counsel made no objection to it on the basis of voluntariness; and Jackson v. Denno applies only where the voluntariness of a confession is attacked; and the Supreme Court of Ohio in State v. Swiger, *supra,* held that appellant had voluntarily ratified or adopted the statement of Swiger as his own.

■ Appellant contended that the State has not met its burden in proving the purpose or intent required by Section 2901.01 Revised Code, which reads: "No person shall purposely * * * in perpetrating or attempting to perpetrate rape, arson, robbery or burglary, kill another." The Supreme Court of Ohio, in disposing of this contention, said:

"As an abstract proposition, it cannot be denied that intent is an essential element in a conviction for murder. However, 'the intent of an accused person dwells in his mind. Not being ascertainable by the exercise of any or all of the senses, it can never be proved by the direct testimony of a third person and it need not be. It must be gathered from the surrounding facts and circumstances under proper instructions from the court.' State v. Huffman (1936), 131 Ohio St. 27, 1 N.E.2d 313, paragraph four of the syllabus.

"The requisite intent may be presumed from what is, in fact, done. It may be deduced from the surrounding circumstances. In these cases, the uncontradicted testimony and medical reports showed that deceased received a very severe beating around the head and chest, a beating that rendered a 76-year-old woman practically unrecognizable. A footprint was discernible in the blood on her chest. The severity of this beating belies any contention that it can be attributed to anything other than deliberate acts, and men are presumed by law to intend the reasonable and natural consequences of acts deliberately done. See State v. Farmer (1951), 156 Ohio St. 214, 102 N.E.2d 11.

"It cannot be said that death is not a natural consequence of such a beating as was inflicted herein on a 76-year-old woman. Therefore, this being an issue upon which reasonable minds could differ, the question of intent is one for the trier of facts. The severity of the beating administered is sufficient 'other evidence,' as required by the *Farmer case, supra,* to warrant a finding by the triers of fact that defendants possessed the requisite intent. That such intent was found is obvious. Defendants' contention that the state failed in its burden of proof in this instance is without merit." State v. Swiger, 5 Ohio St.2d 151, 157, 214 N.E.2d 417, 423.

Section 1.17 of the Ohio Revised Code, provides:

"Any person who aids, abets, or procures another to commit an offense may be prosecuted and punished as if he were the principal offender."

Under the evidence, the jury could properly find appellant guilty as an aider or abettor.

One concluding observation should be made. It seems somewhat unusual that when witnesses are available, a recording of their prior statements should be used without further resort to their oral testimony in open court. The reason for this appears in the insistence of appellant's counsel on the point, and counsel for the State acceding to it. Counsel for appellant repeatedly objected to testimony by the officers present as to what Swiger said, *on the ground that the recording constituted the best evidence.* This was the reason the recording was used, rather than using as a witness the man who made the recording or any testimony by any of the officers about the recording and appellant's ratification of it.

We have repeatedly reviewed the copious transcript of 741 typewritten pages of the testimony in the trial court, the opinion of the Supreme Court of Ohio on the appeal of this case, the briefs of counsel on this appeal, and we conclude that

there was no deprivation of any of appellant's constitutional rights; no error in the admission of the evidence on the trial, or in any proceedings of the trial court; and that there was overwhelming evidence of the guilt of appellant.

The District Court, in passing upon appellant's petition for a writ of habeas corpus, considered his claims that he was deprived of his federal constitutional rights in this trial, and that he was convicted on improperly admitted hearsay evidence. In a comprehensive opinion, the district judge found there was no merit to appellant's claims and we are in agreement with this finding.

We find the contention that the State's reference to appellant's 1935 conviction, which was brought out originally by defense counsel, deprived appellant of his rights under the Sixth and Fourteenth Amendments, is not meritorious.

In accordance with the foregoing, the order denying the petition for a writ of habeas corpus is affirmed for the reasons set forth in the opinion of Judge Joseph P. Kinneary.