HARRIS, Presiding Judge.
Appellant was convicted of murder in the first degree and the jury fixed his punishment at life imprisonment in the penitentiary. Prior to trial appellant signed a written waiver of arraignment and entered a plea of not guilty and not guilty by reason of insanity. After sentence was imposed he gave notice of appeal and requested a free transcript. He was furnished a free transcript and one of his trial attorneys was appointed to represent him on this appeal.
The evidence presented by the State made out a clear case of murder in the first degree with no mitigating or extenuating circumstances. He shot an unarmed man with a twelve gauge pump gun three times while the victim was sitting in a chair or bench on the front porch of a house at 1532 West Fifth Street located in the Oak Park area of the City of Montgomery. The homicide took place around ten o’clock on the night of August 7, 1977. Appellant did not testify, nor did he offer any evidence in his behalf.
At the conclusion of the State’s case appellant filed a written motion to exclude the State’s evidence on the following grounds:
1. The State failed to prove venue.
2. The State failed to present a prima facie case.
3. The State failed to sustain the burden of proof.
4. The testimony is insufficient to overcome the presumption of innocence.
5. There is a fatal variance in the allegations of the indictment and the proof.
The trial court overruled and denied the motion to exclude.
Mattie Pearl Fuller testified that, on Sunday night, August 7, 1977, she. lived with her husband and daughter at 1532 West Fifth Street in Oak Park and had lived at this address for approximately five years. She stated that appellant, the deceased, James Landon, and Willie Lewis Calhoun were sitting on her porch talking; that she did not hear any argument but she did hear appellant tell the deceased to get off the porch. After hearing this statement she went inside her house to look at television. About ten minutes later she heard three shots. She sat for a few moments and started to walk back to the front porch. She looked through the screen and, “I saw James laying across my door, and I saw Robert get in his car and leave.” She further testified that appellant lived at 1544 West Fifth Street which was three houses from the scene of the shooting. She stated she did not see the deceased with a weapon of any kind at the time the three men were sitting on her porch.
Jenny Knight testified that she lived on West Fifth Street and that she knew both appellant and the deceased. Appellant lived in the next house from her home. The houses on West Fifth Street are very close to each other. She further testified that she rented a room to a girl by the name of Lonnie Fitzpatrick and they were both on her front porch on the night of August 7, 1977. She stated that while she and Lonnie were standing on her front *689 porch she saw appellant enter his house and return with a shotgun; that he went to the side of his car which was parked in his yard close to a tree. She saw appellant put the gun to his shoulder when he was close to the tree. She stated that the front porch of Mattie Fuller’s house was about fifty feet from the place where she saw appellant throw the gun up to his shoulder. When appellant placed the gun to his shoulder Jenny Knight ran inside her house and three or four minutes later she heard three shots. After the shots were fired she came out of her house to look and she saw appellant going back inside his house with his gun. Moments later she saw appellant come from his house and get in his car and put the gun down beside him in the car. She observed him as he drove slowly down the street. She was shown State’s Exhibit No. 2 and identified the photograph as the car that appellant drove away from the scene of the homicide and stated that it was his car.
On cross-examination she testified that she had not seen appellant ‘“since he did what he did.” She further stated that she did not see appellant actually fire the gun, saying “I did not see him fire it, but I seed him when he throwed it up. And when it was fired, who else could have fired it but him.” She testified that the shooting occurred at about ten o’clock on the night of August 7, 1977.
Lonnie Fitzpatrick testified that on August 7, 1977, she was living with Jenny Knight at 1544 West Fifth Street. They were sitting on the front porch together and she saw appellant with a shotgun in his hand. She saw him go in his house and come out with the shotgun; that a man came up to appellant and was trying to talk to him but appellant told the man to get back. She identified this man as Willie Lewis Calhoun. She said that appellant told Calhoun to stand back and then he threw the shotgun up; that he was near a tree when appellant threw the gun up and that in her judgment Mattie Fuller’s front porch was thirty, thirty-five, or forty feet away from the place where appellant threw up the gun. When she saw appellant throw up the gun she ran into the house and got as far as the bedroom when she heard three shots. After the firing ceased she came back to the porch and saw appellant backing out of his driveway. This witness also identified State’s Exhibit No. 2 as a photograph of appellant’s car and the one he drove away from his home after the shooting.
On cross-examination this witness stated that appellant’s car was a Buick and it was parked in his yard before the shooting. She described the car as a white Buick with a white vinyl top.
Willie Calhoun testified that he lived at 1520 West Fifth Street in Oak Park, and that he knew both appellant and the deceased; that on the night of August 7, 1977, he was on Mattie Fuller’s porch with the appellant and the deceased. Calhoun said he had been there about ten minutes when appellant made a statement to the deceased coupled with an ugly word. He quoted appellant as saying to the deceased, “I am tired of you so and so with me. Said I am going to settle this once and for all.”
From the record:
“A. Well, he walked off the porch, and I sat there a few minutes, and I went on behind him. When I got there he was coming out of the house with his shotgun.
“Q. Who was?
“A. Mr. Lee.
“Q. And whose house did he go to?
“A. He went to his house.
* * * * * *
“Q. Did you see him come out the house?
“A. Yes.
“Q. What did he have with him?
“A. A shotgun.
“Q. Did you say anything to him?
“A. I begged him — I told him — I said, Jessie come here and let me talk to you. I said, don’t do that. He said, get back. He said, you better get back. So naturally, Pm going to get back.
“Q. And did he stop some place?
“A. He stopped there and aimed at him.
*690 “Q. Where did he stop?
“A. Out there by that tree in his yard.
“Q. The tree in his yard?
“A. That is right.
“Q. In ycur judgment, how far would that tree be from where Mr. Landon was?
“A. I would say forfy-nine or fifty feet.
“Q. And when Mr. Lee stopped, what did he do with that gun?
“A. He click click, (indicating) And he shot three times.
* * * * * *
“Q. Did you see what he hit with the shotgun, if anything?
“A. I saw Mr. Landon.
“Q. What happened to Mr. Landon?
“A. He cradled over like this.
“Q. Did you see Robert E. Lee shoot Mr. Landon?
“A. I did.
“Q. How many times did he shoot him?
“A. Three times.
“Q. And what was Mr. Landon doing when Mr. Lee shot him?
“A. Sitting down.”
On cross-examination this witness testified that appellant told the deceased to pull his knife and the deceased put his hand in his pocket and stood up but he did not pull a knife. The witness testified that appellant walked away and the deceased sat back down. The deceased did not have his hand in his pocket at the time he was shot and killed. He further stated that he did not see the deceased with a weapon of any kind and he did not say a word to appellant before he was shot.
Several officers from the Montgomery Police Department took part in the investigation of this homicide. They went to the scene of the shooting and learned that appellant did the shooting. A radio dispatch was broadcast for appellant and a description of the automobile was given over the radio. The radio dispatch also stated that a shotgun was used in shooting the deceased.
Police Officer Joseph Hardy, Jr., acting in response to the police radio dispatch, went to Sayre Street and found the automobile parked about fifty feet out in the intersection of Sayre Street near the intersection of Elizabeth Street. No one was in the parked vehicle. Officer Hardy found appellant in a house near the intersection of these streets. He asked appellant his name and he told him. He placed appellant under arrest and put him in his patrol car. Appellant told the officer that the parked car belonged to him. After putting the appellant in the patrol car Officer Hardy walked to appellant’s car and looked through the car window and saw a shotgun lying flat on the front seat. The officer retrieved the shotgun and carried it to the patrol car. Hardy did not ask appellant any questions other than his name and who owned the parked vehicle. Hardy scratched his initials on the gun, his badge number and the date. At this point the City detectives arrived and they took over the investigation.
Hardy further testified that the shotgun was lying on the front seat of the car and was in plain view; that he did not have to open the car door to see the shotgun and he did not conduct a search of the automobile. He carried the gun to Police Headquarters and impounded it; that ended Hardy’s connection with this case.
Appellant moved the Court to suppress the shotgun as evidence on the ground that the arrest was illegal. The Court denied the motion.
Photographs were taken of the murder scene and the body of the deceased before he was carried to the funeral home. These were introduced into evidence over appellant’s objections.
The investigating officers found three spent shotgun shells near a tree in appellant’s yard where the witness Calhoun testified appellant was standing when he fired three times at the deceased. The spent shells and the shotgun were turned over to a Criminalist in the Department of Toxicology. This witness, Tom Hopen, test-fired the gun and compared the spent shells with those used in test-firing the gun. He definitely determined that one of the spent shells was fired from the gun belonging to appellant and stated the other two spent *691 shells had the same characteristics as the one that was actually fired by the gun.
Dr. Richard Roper, State Toxicologist, performed a post-mortem examination on the body of the deceased. He found a pattern of penetrating wounds over the face and chest of the deceased. These wounds numbered ninety. In summary he stated:
“On examining the organs of the chest and abdomen or stomach area, I found penetrating wounds through the heart, through the aorta, which is one of the major arteries out of the heart, the major blood distributor. Wounds through the carotid artery, or the right carotid artery, which is the main artery on the right side, up to the face and brain. And wounds in the lungs. The chest cavity was filled with blood.”
Dr. Roper gave his opinion that the cause of death was the result of acute internal hemorrhage, or massive internal bleeding, subsequent to a shotgun wound to the body. He stated that the pattern of shots indicated they were fired from over twenty feet away.
During the testimony of Tom Hopen the State identified and introduced into evidence the clothing the deceased was wearing at the time he was shot. He stated that he received the clothing from Detective Totty. It developed that the clothing had been cut at the time Mr. Hopen received it, and there was no testimony as to when or by whom it was cut. Upon motion of appellant the Court excluded all the clothing as evidence in the case. In doing so the Court explained to the jury:
“Ladies and Gentlemen, the only reason the Court ruled like that is because of this cutting. So do not consider anything at all about the clothing. The reason the Court has done that is because it was pointed out that the clothing had a cut on there that was not established, so the Court does not feel that it should be admitted; and the Court will instruct you not to consider anything at all about the clothing.”
Appellant’s automobile was impounded the night of the homicide and the next morning Detective Totty was told by Detective Mobley to “process” the car and to take all physical evidence that might have any connection with the case. In the course of “processing” the car Detective Totty found a shotgun shell. He stated the plastic part was pushed down into the crack between the back area and the seat area. He said one could see the gold metal sticking out and it was obvious. He took a photograph of the interior of the car showing the shell. This photograph was identified as State’s Exhibit No. 16 and was offered into evidence. Appellant objected to the photograph on the ground that no search warrant had been obtained to search the impounded car. The Court sustained the appellant’s objection and the photograph was excluded.
The night of the homicide Detective R. D. Mobley interviewed appellant in the Detective Office at Police Headquarters. Before interrogating him Mobley read him the Miranda rights and warnings and appellant signed a waiver of rights form which was witnessed by Mobley and Detective McRae. Mobley testified that, “The rights were given to the defendant at eleven forty-four p. m. The formal statement was started at eleven fifty-five p. m., and it did not take over approximately ten minutes for the statement.”
The hearing concerning the Miranda rights and the statement made by appellant was had out of the presence and hearing of the jury. The rights form signed by appellant is as follows:
“At the top, it had his name, Robert E. Lee. The place, the Police Department, Detective Office. The date, August the seventh, 1977. The time, eleven forty-four p. m. Charge, murder. Says before asking you any questions, I must explain to you that you can remain silent, that anything you say can be used against you in Court, that you can talk to a lawyer first and that you have the right to the advice and presence of a lawyer even though you cannot afford to hire one. If you cannot afford to hire a lawyer and *692 want to have one present during interrogation, the Court will appoint one before we question you. If you want to answer questions now, you can do so, but you can stop answering at any time. And my signature. And it says I fully understand the foregoing statement and do willingly agree to answer questions. I understand and know what I am doing. No promise or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone.
“Q. Whose signature appears beneath that?
“A. Robert E. Lee.
“Q. Did you see him put it there?
“A. Yes, Sir.
“Q. Did he at any time ask to speak to a lawyer?
“A. No, Sir.
“Q. Did at any point prior to the interview or upon the commencement of the interview, did he ever tell you that he did not want to talk to you?
“A. No, Sir.
“Q. Did you force, threaten or coerce him to get him to talk to you?
“A. No, Sir.
“Q. Did you offer him any reward, hope of reward, or promise or hope of lenient treatment to get him to talk to you?
“A. No, Sir.
“Q. Did he appear to understand his rights?
“A. Yes, Sir.
“Q. Did you give him a copy to read along with when you read him his rights?
“A. Yes, Sir.
“Q. And after that did you take a statement from him?
“A. Yes, Sir, I did.
“Q. Was that a written statement or an oral statement?
“A. I took an oral at first, and then a written statement from him.
“Q. Then it was reduced to writing?
“A. Yes, Sir.
“Q. And he signed it?
“A. Yes, Sir.
“Q. And you signed it?
“A. Yes, Sir.
“Q. And you saw him place his signature there?
“A. Yes, Sir, I did.”
At the conclusion of the voir dire hearing the Court ruled that appellant voluntarily signed the waiver of rights form. The Court further found that no promises were made to appellant to get him to make a statement concerning the shooting, and no threats, rewards, or other inducements were made against him, or held out to him, to get him to make a confessory statement. In short, the Court ruled that appellant freely, voluntarily and understandingly signed the statement.
Back before the jury the State laid the proper predicate and the confessory statement was admitted into evidence.
The statement reads as follows:
“August 7, 1977
Sunday
11:55 P.M.
“This is a statement taken from Robert E. Lee concerning the death of James Landun. This statement is taken by Det. R. D. Mobley.
“He told me, he said the next time that me or you cross that it will be me or you and thats it. Then he got up and he went in his pocket and so all I did was backed up and turned around and then I went and got mine and so then I did some shooting. Then I got in my car and I left.
“Q. What was the man’s name that you shot?
“A. All I know is they call him red, that’s all I know.
“Q. Did you see a knife or any other weapon in his hand?
“A. No when he went in his pocket I just backed off.
“Q. Where was he when you shot him?
“A. He was sitting in a chair in a lady named Mattie Fuller’s front porch.
“Q. What did you shoot him with?
“A. A shotgun.
“Q. How many time did you shoot him?
*693 “A. I don’t know.
“Q. Where was your shotgun at when you went and got it?
“A. In my house.
“Q. Where were you standing when you shot him?
“A. I don’t know.
“Q. What were yall arguing about when he said that it would be you or him next time?
“A. I think I have answered enough questions for you.
“Q. Is there anything else that you would like to add to this statement?
“A. That’s all.
“I have read or had this statement read to me and it is true and correct to the best of my knowledge.
“Wit, /s/ E. D. Moblev
Det. E. D. Mobley
/s/ Eobert E. Lee
Eobert E. Lee”
Appellant contends that this case should be reversed for two reasons: (1) that the confession was inadmissible because it was the fruit of a poisonous tree, and (2) it was improper to admit the bloodstained clothing of the deceased over appellant’s objection and then to later exclude the clothing. We do not agree with either contention.
Appellant bottoms his first contention on the fact that the arresting officer asked appellant his name and if the car parked on a public street belonged to him, all without advising him of his constitutional rights.
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the Supreme Court said:
“Our decision is not intended to hamper the traditional function of police officers in investigating crime. See Escobedo v. Illinois, 378 U.S. 478, 492, 84 S.Ct. 1758, 1765, 12 L.Ed.2d 977. When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-seene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.”
Not by the broadest stretch of the imagination can it be said that the arresting officer elicited an admission or confession from appellant concerning the shooting of the deceased. It is clear in this case that the only confession made by appellant was at Police Headquarters after he had been fully informed of his constitutional rights. The actions and conduct of the arresting officer were limited to an on-the-scene investigation in an effort to obtain evidence in the field to be used at appellant’s trial.
As to appellant’s second contention, we hold that when it was shown that the clothing worn by the deceased at the time he was shot and killed had been cut or otherwise altered after being removed from his body the trial court properly excluded it from the jury’s consideration. No error intervened here.
This was a cold blooded and senseless killing. The evidence presented by the State was so convincing that it took the jury only eleven minutes to return a verdict.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIEMED.
All the Judges concur.